TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER

## COMMONWEALTH OF MASSACHUSETTS

.......... MIDDLESEX .......... , ss

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No. 1681CV00988

.Mark..Brader.................... , Plaintiff(s)

v.

..Biogen,.Inc.................. , Defendant(s)

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon Jeremy Y. Weltman, Esq.

.................................................. plaintiff's attorney, whose address is 60 Walnut Street

4th Floor Wellesley, MA 02481 .............., an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at ...................................

.......................................................... either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

Witness, **Judith Fabricant**, Esquire, at .............................................................................

the ............................................... day of ...............................................................

....................., in the year of our Lord ...................................... .

A true copy Attest

Deputy Sheriff Suffolk County

............................................

Clerk

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on ..................................................................................
20........., I served a copy of the within summons, together with a copy of the complaint in this action,
upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5)):

.................................................................................................................................................

.................................................................................................................................................

.................................................................................................................................................

.......................................................................................

Dated: ..................................................................................................., 20..........

**N.B.**  **TO PROCESS SERVER:**
**PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX**
**ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**

(  _____  )

(  ............................................, 20.......... )

(  _____  )

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX ........, ss.

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No. 1681CV00988

Mark Brader ................, Plff.

v.

Biogen Inc ................, Deft.

SUMMONS
(Mass. R. Civ. P. 4)

| CIVIL TRACKING ORDER<br>(STANDING ORDER 1- 88) | DOCKET NUMBER<br>1681CV00988 | Trial Court of Massachusetts<br>The Superior Court  |
|---|---|---|

| CASE NAME:<br>Brader, Mark vs. Biogen,Inc. | Michael A. Sullivan, Clerk of Court<br>Middlesex County |
|---|---|
| TO:   Jeremy Y. Weltman, Esq.<br>Kerstein, Coren & Lichtenstein LLP<br>60 Walnut Street<br>4th Floor<br>Wellesley, MA 02481 | COURT NAME & ADDRESS<br>Middlesex County Superior Court - Woburn<br>200 Trade Center<br>Woburn, MA 01801 |

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                                    DEADLINE

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 07/06/2016 | |
| Response to the complaint filed (also see MRCP 12) | | 08/05/2016 | |
| All motions under MRCP 12, 19, and 20 | 08/05/2016 | 09/06/2016 | 10/04/2016 |
| All motions under MRCP 15 | 08/05/2016 | 09/06/2016 | 10/04/2016 |
| All discovery requests **and depositions** served and non-expert despositions completed | 02/01/2017 | | |
| All motions under MRCP 56 | 03/03/2017 | 04/03/2017 | |
| Final pre-trial conference held and/or firm trial date set | | | 07/31/2017 |
| Case shall be resolved and judgment shall issue by | | | 04/09/2018 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

781 939 2781

| DATE ISSUED<br>04/07/2016 | ASSISTANT CLERK | PHONE |
|---|---|---|

Date/Time Printed: 04-07-2016 12:43:06

SCV026\ 11/2014

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| PLAINTIFF(S): | Mark Brader, Ph.D. | COUNTY |
|---|---|---|
| ADDRESS: | 3 Hayes Avenue | Middlesex |
| Lexington, MA 02420 | | |

| | DEFENDANT(S): | Biogen, Inc. |
|---|---|---|

| ATTORNEY: | Jeremy Y. Weltman | |
|---|---|---|
| ADDRESS: | Kerstein, Coren & Lichtenstein LLP | ADDRESS: | 225 Binney Street |
| 60 Walnut Street | | Cambridge, MA 02142 |
| Wellesley, MA 02481 | | |
| BBO: | 662293 | |

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B22 | Employment Discrimination | F | ☒ YES    ☐ NO |

*If "Other" please describe:

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses ................................................................................................. $ _____
    2. Total doctor expenses .................................................................................................. $ _____
    3. Total chiropractic expenses ......................................................................................... $ _____
    4. Total physical therapy expenses ................................................................................. $ _____
    5. Total other expenses (describe below) ....................................................................... $ _____
                                                  Subtotal (A): $ _____

B. Documented lost wages and compensation to date ........................................................... $ _____
C. Documented property damages to dated .......................................................................... $ _____
D. Reasonably anticipated future medical and hospital expenses ........................................ $ _____
E. Reasonably anticipated lost wages ................................................................................... $ _____
F. Other documented items of damages (describe below) ..................................................... $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:
Plaintiff seeks damages for employment discrimination, retaliation and ultimate termination suffered at the hands of the Def.

violating the Americans w Disabilities Act and MGL c. 151B. Plaintiff's base salary at termination exceeded 6 figures.

TOTAL (A-F):$ 25,001+

### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

TOTAL: $ _____

Signature of Attorney/Pro Se Plaintiff: X _____     Date: 4/4/16

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

## CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____     Date: 4/4/16

## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, ss.**                     **SUPERIOR COURT DEPT.**
                                                  **CIVIL ACTION NO. MICV2016-CV-**

| | |
|---|---|
| *MARK BRADER,* | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| *v.* | ) |
| | ) |
| *BIOGEN, INC.* | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

## VERIFIED COMPLAINT

### I.    INTRODUCTION

1.    This case involves claims of employment discrimination, in various shades, suffered by Plaintiff, Mark Brader, Ph.D. (hereinafter "Dr. Brader"), at the hands of Defendant, Biogen, Inc. (hereinafter "Biogen").

2.    Biogen knew or should have known by July 2014, at the very latest, that Dr. Brader was suffering from an acute mental impairment. By no later than August 2, 2015, Biogen knew or should have known by direct written report of Dr. Brader (Dr. Brader made his first oral reports to his primary discriminator's supervisor that he "didn't feel safe at work" thanks to his supervisor's disparate and abusive treatment of him as early as June 2014) that his direct supervisor was discriminating against him based on his mental illness and disability with the ultimate goal of ensuring Dr. Brader's termination.

3.    Unfortunately, instead of offering him a reasonable accommodation (or even a fair opportunity to sit-down and have a frank and fair discussion concerning the discrimination and disparate treatment he was enduring), and in fact under the guise of

concern for the same, after management finally formally scheduled a sit-down meeting with Dr. Brader for "early October [2015]" to review his grievance with the way Dr. Andrew Weiskopf (the primary discriminator) was treating him, he was terminated.

4.      Literally one (1) day before he was actually scheduled to meet with management, he received notice that he was being "let go," along with a proposed Separation Agreement from Biogen that, if accepted, would force Dr. Brader to release all claims he has or could ever have against Biogen.

5.      Dr. Brader was never given the fair opportunity to voice his concerns regarding the discrimination and disparate treatment he was enduring at the hands of his direct supervisor because Biogen, through its management, terminated him before he could ever do so. With the prospect of a workforce reduction on the horizon, instead of providing Dr. Brader with a reasonable accommodation (or even the chance to be fairly heard), Biogen simply eliminated the "problem" using the workforce reduction as its pretext.

6.      Considering Dr. Brader's eight (8) year flawless history with the company, the evident high esteem in which he was held by his colleagues within his department and Biogen as a whole, and his recent breakthrough innovation concerning his "Crystallization concept," it is painfully apparent that his inclusion in Biogen's "workforce reduction" is nothing more than a pretext in which to cloak discriminatory animus toward Dr. Brader on account of his mental illness.

7.      The Plaintiff, Dr. Brader, therefore brings this action seeking compensatory and punitive damages under The Americans With Disabilities Act, 42 U.S.C. §12131, *et seq.* and Mass. Gen. Laws c. 151B.

2

## II.     THE PARTIES

8.     The Plaintiff, Mark Brader, Ph.D., is an individual residing in Lexington, Massachusetts. Until November 6, 2015, Dr. Brader was employed by Biogen as a Principal Scientist, Protein Pharmaceutical Development (hereinafter "PPD"), in Biogen's Cambridge, Massachusetts office.

9.     The Defendant Biogen is a foreign corporation qualified to do business in the Commonwealth, with a principal office at 225 Binney Street, Cambridge, Massachusetts 02142.  Biogen regularly conducts and transacts business in the Commonwealth, deriving substantial economic benefit from such business.

## III.    JURISDICTION AND VENUE

10.     Jurisdiction is conferred upon this Court pursuant to the provisions of Mass. Gen. Laws c. 212, § 3 and 4 as well as Mass. Gen. Laws c. 151B, §9.  Venue in Middlesex County is proper pursuant to Mass. Gen. Laws c. 223, § 1.

## IV.    STATEMENT OF FACTS

### A.     Dr. Brader's Exemplary Record with Biogen

11.     Biogen first extended Dr. Brader an offer of employment to join Biogen as a Senior Scientist, BioPharm Development, on August 9, 2007. The position was based out of Biogen's San Diego, California facility and offered a base salary of $128,000.08, short-term incentive, long-term incentive and a "robust and highly competitive employee benefits program."

12.     Dr. Brader accepted Biogen's offer of employment on August 13, 2007 and was scheduled to start on October 8, 2007.

3

13.     By August 19, 2009, Biogen management formally recognized Dr. Brader's contribution to the Technical Development division by awarding him a mid-year promotion to Principal Scientist. His Year-End Performance rating for 2009 was "Solid Performance – High".

14.     On November 3, 2010, Biogen offered Dr. Brader the opportunity to relocate his position to Cambridge, Massachusetts, reporting directly to Kevin Maloney. There was no change in salary, target bonus, or continued eligibility for employee benefits.

15.     Dr. Brader loyally accepted Biogen's offer to relocate on December 31, 2010 and ultimately relocated to Massachusetts on June 30, 2011.

16.     Dr. Brader's first performance review after relocation resulted in a "Solid" rating and including comments such as "[s]pearheaded much of PPD formulation's technology initiatives in 2011 and identified and set up key directives for PPD in 2012. These initiatives have fostered key collaborations, provided opportunities for PPD scientists and delivered tangible results."

17.     Dr. Brader's Performance Reviews for 2012, 2013 and 2014 were no different.

18.     Dr. Brader's 2012 Historical Performance Review resulted in a "Solid" rating and included comments such as "Mark has had a strong contribution this year. 2013 will see the fruits of his labor on PEG IFN with regard to regulatory [sic] review and approval of 2 important drugs that Mark has led the technical formulation development on....Mark is an example of scientific excellence in his role and his engagement outside of BIIB. His strength in presentations, publications, patent, and networking will position BIIB for success in our drug delivery gaps going forward."

19.     Dr. Brader's 2013 Historical Performance Review resulted in an "Exceptional" rating: "This year, Mark not only made outstanding contributions in advancing new technologies in PPD, but he did so in a way that influenced the direction of two groups within the department (Formulation/Process Development and BMC)....the soundness of the science he applied to these projects...was evident from the absence of regulatory inquiries into these aspects of product development....With respect to core behaviors, Mark received highly positive feedback from stakeholders, who appreciated his naturally mentoring style towards direct reports and other staff and his ability to embrace "blue sky" thinking while staying mindful on ultimate objectives. Mark embodies a strong clarity of purpose and a great drive for results. He is widely viewed as an ethical colleague who treats others with respect and integrity."

### B.     Dr. Brader's Acute Mental Illness and Disability

20.     Dr. Brader's 2014 Year End Review resulted in yet another "Solid" rating; however, beyond its usual glowing comments about his performance, the 2014 Year End Review is noteworthy for another reason. Therein, Kristen McQuaid (a Biogen manager) acknowledges that while she is "very happy to have him back with the team full-time heading into this year," she opens by stating that "2014 was a [sic] certainly a difficult year for Mark personally." Ms. McQuaid closes Dr. Brader's Review by stating "Thank you Mark - my best wishes to you for a healthy and innovative 2015."

21.     The note identified in the preceding paragraph is important because it establishes in writing that by no later than the date that his 2014 Year End Review was completed by Biogen management, Biogen knew or should have known that Dr. Brader

had established a record of having a mental impairment sufficient that could require a reasonable accommodation by Biogen.

22.    Indeed, Ms. McQuaid is making specific (albeit respectful) reference in the 2014 Year End Review to the embarrassingly public mental health episode that Dr. Brader suffered at Biogen in June 2014.

23.    On June 30, 2014, Dr. Brader requested a meeting with Jessica Ballinger (his direct supervisor's supervisor) to discuss a solution for the fact that, thanks to ulterior motives that appeared to be stemming in large part from jealousy and a desire to take undue credit for Dr. Brader's significant work within the TD department, he did not feel safe at work due to the way Dr. Weiskopf was treating him.

24.    In the weeks prior, following a high-profile presentation Dr. Brader had made to a large audience of the PPD department within Biogen (for which he received management and peer praise), Dr. Weiskopf unfairly berated Dr. Brader during a mid-year performance review for what he claimed was an "appalling technical presentation" and for "using it to deliberately disparage PPD." Dr. Brader was bewildered and confused by the sudden non-sensical criticism. This was the very first instance that Dr. Brader became aware of Dr. Weiskopf's malice toward him and he was totally blind-sided. This 2014 mid-year review happened to be particularly critical because it coincided with Dr. Brader being considered by Biogen management for mid-year promotion - a promotion that would have placed Dr. Brader at the same level of seniority as Dr. Weiskopf.

25.    Dr. Weiskopf's stunningly insidious actions left Dr. Brader shaken to his core as he had never before experienced such shocking misbehavior from a manager in his

20+ year employment history. By the end of June 2014, Dr. Brader felt there was no other option but to address the situation directly with Ms. Ballinger, Dr. Weiskopf's supervisor.

26.     During the June 30, 2014 meeting, Dr. Brader reported that Dr. Weiskopf was, through subtle nuance and suggestion, and by frequently shifting Dr. Brader's assigned goals and objectives, working to denigrate his exemplary performance record within Biogen, apparently due to some sort of resentment Dr. Weiskopf was holding against Dr. Brader. Dr. Brader reported to Ms. Ballinger that Dr. Weiskopf's so-called "feedback" over the previous weeks completely transcended reasonable supervisory communication to the point that it was clearly malicious and harassing.

27.     As a result of the way Dr. Weiskopf was treating him, Dr. Brader reported grave concern to Ms. Ballinger at the June 30 meeting about the hostile work environment in which Dr. Brader was forced to work. Specifically, Dr. Brader informed Ms. Ballinger that his workplace was permeated with discriminatory intimidation, ridicule and insult that were sufficiently severe and pervasive that it quite literally altered the conditions of Dr. Brader's employment – creating such an abusive work environment that Dr. Brader finally reached a breaking point.

28.     Without explanation, and with no prior history of the same, other than to say he was under a severe amount of stress about how the situation with Dr. Weiskopf's verbal abusiveness had ballooned and was seemingly out of his control, Dr. Brader suffered what specialists later described as a major psychotic breakdown in the middle of the June 30, 2014 meeting at Biogen. Dr. Brader recalls ranting about unfair treatment by Dr. Weiskopf for hours in front of literally dozens of Biogen employees until his wife was called to collect him from work.

7

29.     Within hours of Dr. Brader's psychotic breakdown, Dr. Brader received an email from Andrea Sinclair from Biogen Human Resources advising him that he should call the "employee helpline" if he has concerns about feeling safe at work. In other words, as of this June 30, 2014 email from HR, Biogen knew without a doubt that Dr. Brader was the subject of claimed hostile work environment thanks in particular to the behavior of his immediate supervisor, Dr. Weiskopf.

30.     Dr. Brader was taken to Lahey Emergency Department and, within a few days, transferred to Lahey Beverly Psychiatric Facility where he remained in in-patient care for approximately three (3) weeks – all as a direct result of the hostile work environment that Biogen permitted Dr. Weiskopf to perpetrate through disparate and discriminatory treatment of Dr. Brader.

31.     Following his very public psychotic breakdown on June 30, 2014, Dr. Brader's mental condition should have been apparent to his colleagues and supervisors. If not, it certainly should have been the case after Dr. Brader's illness led him to draft a number of garbled and sometimes nonsensical emails to colleagues and Biogen management wherein he focused incessantly on drawing attention of senior Biogen management to the terrible environment that existed at the time within his department, PPD.

32.     These emails culminated in a crushingly embarrassing email sent to George Scangos (CEO of Biogen), his supervisor Andrew Weiskopf, other senior management, colleagues and his wife on July 7, 2014, while being treated at Lahey Beverly Psychiatric Facility.

33.    The July 7, 2014 email is significant because a plain reading evidences that it is written by someone who has a severe mental illness and who was pleading for help. This someone was, for seven (7) years previous, a well respected and high performing employee of Biogen with an exemplary record.

34.    If nothing else, the July 7, 2014 email (coupled with the various emails that preceded it) put Biogen on notice that Dr. Brader had a severe disability that may require a reasonable accommodation moving forward.

35.    Moreover, the July 7, 2014 email refers directly to the trigger for his acute hospitalization; e.g., in addressing his supervisor Dr. Weiskopf, he states "I take full responsibility for the slides, I did try my best in my ppd tech review presentation, but I know now that just wasn't good enough."

36.    The reference to "the slides" and the "tech review presentation" in the preceding paragraph come directly from the psychotic breakdown-inducing June 30, 2014 discussion Dr. Brader had engaged in with Ms. Ballinger concerning how Dr. Weiskopf attempted to negatively frame Dr. Brader's complaint of him in terms of hurt feelings for criticism of a recent slide presentation that Dr. Brader had given (a curious allegation by Dr. Weiskopf to begin with considering Dr. Brader's 2012 Historical Performance Review speaks specifically to Dr. Brader's prowess with respect to "giving presentations" and the fact that for many years, Dr. Brader has been a regular invited speaker at leading national and international biotechnology industry conferences).

37.    In fact, it was in large part the constant verbal abusiveness that Dr. Brader suffered at the hands of his direct supervisor (Dr. Weiskopf) that finally drove him to his June 30, 2014 mental breakdown. Dr. Brader has been informed by a duly licensed

9

psychiatrist that, in his professional opinion to a reasonable degree of medical certainty, it was the very psychological abuse that Dr. Weiskopf directed toward Dr. Brader, coupled with the overall hostile work environment he was forced to endure, that was directly responsible for his June 30, 2014 psychotic breakdown.

### C.   Discrimination, Hostile Work Environment, Disparate Treatment, Failure to Accommodate and Retaliation

38.     After months of treatment, recovery and a positive prognosis, when Dr. Brader returned to work in late October 2014, Biogen placed him in the exact same hostile work environment with the exact same supervisor, Dr. Weiskopf.

39.     Unfortunately, *Biogen placed Dr. Brader into this same hostile work environment despite knowing by the end of the summer of 2014 that Dr. Weiskopf's discrimination of him was major contributing factor leading to Dr. Brader's disability.*

40.     Within months of his return, presumably smelling the proverbial blood in the water, Dr. Weiskopf *accelerated* his verbal and emotional bullying of Dr. Brader, now clearly discriminating against him by attempting to *use* his mental illness against him, hoping to drive Dr. Brader to the point of another psychotic breakdown, and ultimately out of Biogen.

41.     Dr. Brader did his best to focus on his work and "manage" the obvious resentment and discriminatory animus Dr. Weiskopf was exhibiting toward Dr. Brader. While he may have been unpleasant and difficult previous to Dr. Brader's mental health episode, at all turns after Dr. Brader's return to work in October 2014, Dr. Weiskopf took the opportunity to exact retaliation upon Dr. Brader and treat Dr. Brader differently and unfairly based on his discriminatory animus toward Dr. Brader – evidenced in part by Dr.

Weiskopf's ongoing dedication to taking advantage of Dr. Brader's fragile mental state in order to drive him out of Biogen.

42.    Dr. Wieskopf's pettiness toward Dr. Brader is classically evidenced in a June 30, 2015 Email from Dr. Weiskopf to Dr. Brader wherein he notes that before he approves Dr. Brader's "BIG Award" nomination he wanted to give to a member of his team (a small incentive provided to Biogen employees who go above and beyond on a particular task), he questioned Dr. Brader as to whether he submitted the same award nomination to the other members of the organizing committee, essentially accusing Dr. Brader of impropriety/inequity.

43.    Dr. Weiskopf goes so far as to close the June 30, 2015 email by questioning the amount of the award to be awarded, quite literally pointing out that he would have nominated at the lower $150 level as opposed to the $300 that Dr. Brader was asking for his team member.

44.    In the face of this ongoing discrimination and disparate treatment, in June, 2015, Dr. Brader made an important presentation to Biogen's Operations, Technology and Innovation group (hereinafter "OTI") (OTI was a large organization within Biogen having the expressed goal of identifying and nurturing game-changing or disruptive innovation) of a new concept he called "Crystallization." The concept was very well received and pushed forward with great alacrity within the ranks of Biogen due to the concept's importance with respect to Biogen's ongoing work with Alzheimer's.

45.    By July 29, 2015, a "small proof of concept" was in the works for Dr. Brader's Crystallization concept. All the while, Dr. Weiskopf's animus toward Dr. Brader was seething just under the surface, and Dr. Brader's recent companywide

11

acknowledgement for the scientific originality and therapeutic significance of his Crystallization concept only added fuel to the proverbial flame of Dr. Weiskopf's jealously.

46.     Instead of working with Dr. Brader to advance the Crystallization concept as a team when it was first brought to him by Dr. Brader in March 2015, Dr. Weiskopf told Dr. Brader that this idea was "too abstract" and that he would not help Dr. Brader bring it forward to senior management because it "would make [Dr. Brader] look stupid" were he to continue to pursue it. In the face of Dr. Brader's rise in visibility and the accolades he was receiving from OTI regarding his Crystallization concept, Dr. Weiskopf provided a mid-year performance review in July 2015 claiming that he had received "no positive feedback on Mark's innovation work." The meeting lasted nearly two (2) hours, the large majority of time consumed by Dr. Weiskopf unfairly berating Dr. Brader.

47.     Dr. Weiskopf's behavior described in the preceding paragraph was a mirror image of the behavior from the year prior that caused Dr. Brader's psychotic breakdown – Dr. Weiskopf (and Biogen) knew or should have known this to be the case.

48.     The discriminatory animosity by Dr. Weiskopf of Dr. Brader, evidenced by his incessant disparate treatment of Dr. Brader, became fully apparent when Dr. Weiskopf submitted his written 2015 Mid Year Review of Dr. Brader in late July, 2015.

49.     The 2015 Mid Year Review is starkly different than any other performance review Dr. Brader received during his tenure at Biogen, both in form and content, and was clearly intended to hurt Dr. Brader's eight (8) year reputation of excellence within Biogen.

50.     The fabricated criticisms being offered by Dr. Weiskopf in the 2015 Mid Year Review was an obvious attempt to create a paper trail of disingenuous allegations in

12

Dr. Weiskopf's now not-so-veiled efforts to eliminate Dr. Brader. It is no coincidence that Dr. Weiskopf lashed out at Dr. Brader in his 2015 Mid Year Review just as Dr. Brader was receiving overwhelming positive feedback and reinforcement from upper levels of management for his Crystallization concept.

51.     Following receipt of his 2015 Mid Year Review, on July 31, 2015, Dr. Brader sent an email to Jessica Ballinger with the subject line "Your advice needed (but after you return from vacation)."

52.     In the July 31, 2015 email, Dr. Brader specifically asks for help with the mental abuse he was continuing to receive from Dr. Weiskopf, requesting "help with my challenge of understanding the performance expectations Andy sets for me, which unfortunately has become an ongoing problem this year....Too many times this year I have invested a lot of effort to understand, clarify and document goals and expectations precisely as he states them – come back with clear metrics of success only to be told I "misunderstood" the goal, or it wasn't a goal at all, or what I perceive to be a clear metric is perceived completely differently by him."

53.     In September 2015, Ms. Ballinger briefly met with Dr. Brader when Dr. Brader handed her a hard copy memorandum that categorically proved that Dr. Weiskopf had fabricated key elements of the July 2015 Mid-Year Review.

54.     In response, Ms. Ballinger told Dr. Brader that a formal sit-down discussion concerning the issues raised in Dr. Brader's July 31, 2015 email (and in the brief September 2015 meeting) would be scheduled for early October. Based on this assurance, and still hoping to salvage the professional relationship with Dr. Weiskopf, Dr. Brader decided to hold off on the filing of a formal complaint with HR regarding his disparate

treatment by Dr. Weiskopf until after his meeting with Ms. Ballinger, despite the fact that he had already drafted the complaint in early August.

55.     Unfortunately, it is now clear that Ms. Ballinger never intended to actually keep her scheduled meeting with Dr. Brader as she ultimately rescheduled her early October sit-down meeting with Dr. Brader for October 22, 2015, knowing full well he would receive Biogen's proposed Separation Agreement and notification of his termination from the Biogen workforce the day before, on October 21, 2015.

56.     Undoubtedly still reeling from the fact that Dr. Weiskopf had memorialized his animus toward Dr. Brader in the 2015 Mid Year Review, by email dated August 2, 2015, Dr. Brader sought additional help from the Director of Technical Development for Biogen, Brian Fahie. The August 2, 2015 email states, in pertinent part:

> ...despite the obviously positive impact my crystallization concept has had in a very short space of time this year – this week Andy, verbally gave me the worst and most blatantly disingenuous formal mid-year review I have ever had in my career. He spent 2 hours berating me for "not building and sustaining cross functional relationships" for "not delivering on OTI deliverables in a timely manner" and my insisting on bringing this idea forward as an individual and rejecting input from anyone else....So far this year he has not made a single positive acknowledgement to me of the concept itself nor of my efforts to bring it forward – complete lack of moral support and encouragement in any form...Keep in mind that this whole initiative has been a totally unplanned accomplishment, most of which I have worked on during my own personal time at home, there have been no "deliverables" other than a good idea and a presentation to OTI. I can see this for what it is. Andy never puts any of this in writing even though I repeatedly ask him to do that. I believe this is simply a tactic to make me verbally lash out or induce a "cat fight" with Andy so that management can step in and deal with the "problem employee." I'm not going to take that bait. My tactic is that I will be even more apologetic and more cooperative.... I am not worried about trying to gain accolades or recognition this year – a couple of extra thousand $ from a high performance rating is neither here nor there to me and my peers already

14

know I am a good colleague and scientist ... My true goal is a longer term one to try and achieve something important after ~3 years, which hopefully can become a competitive advantage for Biogen, and possibly something that impacts the whole industry....if that happens, I have enough faith in the company that whatever credit I serve for my role will take care of itself in due course.

57.      The August 2, 2015 email could not make clearer to Biogen management that there was a significant problem with Dr. Weiskopf and the way he was discriminatorily treating Dr. Brader.

58.      The August 2, 2015 email further evidences that Dr. Weiskopf was attempting to manipulate Dr. Brader into another mental breakdown, returning to his previous abusive ways from 2014 when the issue first came up with Ms. Ballinger and Dr. Brader suffered his psychotic breakdown.

59.      Unfortunately, during all of this time, Biogen stood idly by and ultimately permitted Dr. Weiskopf and Ms. Ballinger to take advantage of the workforce reduction to prevent him from participating and continuing to spearhead a major technology initiative through application of the Crystallization concept.

60.      The fact that Biogen continues to vigorously pursue the Crystallization concept (and thus, Dr. Brader's inherent value to Biogen were it not for the discrimination he suffered at the hands of Biogen management) is evidenced in a Biogen March 8, 2016 job posting seeking a "Senior Engineer, Crystallization/Particle Engineering."

## V.      CAUSES OF ACTION

### COUNT I
*Violations of the Americans with Disabilities Act, 42 U.S.C. §12131, et seq.*

61.      Plaintiff reasserts and incorporates the allegations of Paragraphs 1-60 of his Verified Complaint as if fully set forth herein.

62.   At least one purpose underlying the ADA is to prohibit employers from excluding persons with disabilities from employment opportunities, unless the person is actually unable to perform the essential functions of the job.

63.   The ADA prohibits employers from limiting, segregating or classifying disabled employees on the basis of disability in a way that adversely affects their employment opportunities or status.

64.   Here, no later than June 30, 2014 when Dr. Brader suffered his very public psychotic breakdown that occurred in front of at least a dozen Biogen employees within his department (including his department supervisor Ms. Ballinger), Dr. Brader had a clearly defined disability within the meaning of the ADA.

65.   Just before that breakdown, Dr. Brader had informed Ms. Ballinger that the workplace Dr. Weiskopf had created for Dr. Brader was permeated with discriminatory intimidation, ridicule and insult that were sufficiently severe and pervasive that it quite literally altered the conditions of Dr. Brader's employment.

66.   Following the June 30, 2014 incident, Dr. Brader was hospitalized where he sent a psychotically ranting email to Biogen's CEO, his supervisor and numerous other colleagues and senior Biogen management.

67.   It is undisputed that Dr. Brader could not even return back to work until late October 2014 due to his mental breakdown.

68.   Further, Dr. Brader continues to treat as a result of the emotional distress he suffered at the hands of Biogen and Dr. Weiskopf.

69.     Dr. Brader has been recently told by his treatment provider that it could take two or more years to fully recover from the psychotic breakdown he suffered at the hands of Dr. Weiskopf's disparate and discriminatory treatment.

70.     Dr. Brader has been informed by a duly licensed psychiatrist that, in his professional opinion a reasonable degree of medical certainty, it was the very psychological abuse that Dr. Weiskopf directed toward Dr. Brader, coupled with the overall hostile work environment he was forced to endure that was directly responsible for his June 30, 2014 psychotic breakdown.

71.     Therefore, there can be no question that, at all relevant times hereto, Dr. Brader suffered from a disability as defined in the ADA.

72.     Despite his very public mental breakdown due to the ongoing harassment he was receiving at the hands of his direct supervisor, Dr. Weiskopf, upon his return to Biogen in October 2014, Dr. Brader was placed under the exact same supervisor.

73.     Even in the face of the events of the summer, as his 2014 Year End Review / Manager Evaluation Notes indicate, "Mark continued to be a leader in innovation,.... He is highly accountable, acts with integrity towards others."

74.     In the Spring of 2015, while continuing to struggle with Dr. Weiskopf's discriminatory treatment of him (who was, by the beginning of 2015, apparently more determined than ever to find a way to backdoor Dr. Brader out of Biogen), Dr. Brader formulated a game changing innovation called the Crystallization concept.

75.     Having been told that his Crystallization concept idea was essentially ridiculous by Dr. Weiskopf, Dr. Brader presented it to and quickly received praise on a companywide level after being singled out by Heather Saforrian, Director of Strategic

17

Innovation for Biogen, for the innovative idea via a late August/early September company webcast.

76. The Crystallization concept earned Dr. Brader special acknowledgement and praise from the Senior Director of Strategic Innovation and the Manager of Business Operations, Technical Support.

77. The Director of Technical Development and Vice President, Technical Development sent him emails supporting his Crystallization based development concept and encouraging Dr. Brader to "keep the momentum."

78. Thus, there can be no question that Dr. Brader was qualified to perform the essential functions of his job.

79. Unfortunately, even after Biogen knew or should have known that Dr. Brader was being subjected to discrimination through the hostile work environment being created by Dr. Weiskopf based on (and, in fact, motivated by) Dr. Brader's disability, when he returned to work in October 2014 following his psychotic breakdown, Biogen saw fit to place him back in the exact same toxic environment that triggered his disability in June 2014 – this, instead of offering him a reasonable accommodation (such as, at a minimum, Biogen management being more assertive with Dr. Weiskopf in requiring him to abide by Biogen's equal opportunity policy of fostering a meritocracy and treating others with respect and integrity as per Biogen's self-identified core values) with respect to the constant abuse he was receiving at the hands of his direct supervisor, Dr. Weiskopf.

80. Indeed, the work environment created by Dr. Weiskopf's actions toward Dr. Brader was one that was pervaded by harassment and abuse, with the resulting intimidation, humiliation and stigmatization suffered by Dr. Brader. This environment

18

posed a formidable barrier to the full participation of Dr. Brader in the workplace, as his eventual pretextual inclusion in the global workforce reduction evidences.

81.     Despite his pleas to upper management of Biogen for help in dealing with the discrimination and disparate treatment by his supervisor after his return to work, he was never given a reasonable accommodation and, instead, was terminated behind the pretext of being included in a global workforce reduction.

82.     On information and belief, Dr. Brader was the only Principal Scientist that was included in the workforce reduction from the Division of Technical Development.

83.     Thus, there can be no question that Dr. Brader was subject to adverse employment action, disparate treatment and a hostile work environment based in whole or in part on his disability in violation of the ADA.

## COUNT II
### *Retaliation For Engaging in Conduct Protected Under the ADA*

84.     Plaintiff reasserts and incorporates the allegations of Paragraphs 1-83 of his Verified Complaint as if fully set forth herein.

85.     Dr. Brader engaged in conduct protected by the ADA when, as outlined further herein, he reported to Biogen management that he was being subject to discrimination at the hands of Dr. Weiskopf.

86.     There are at least two specific incidents where Dr. Brader reported the abusive and discriminatory conduct of Dr. Weiskopf to Biogen management after his return to work in October 2014 following his acute-onset mental disability. Both of these activities constitute protected conduct.

87.     The first conduct protected from retaliation was by July 2015 email to Ms. Ballinger wherein Dr. Brader requests assistance in dealing with Dr. Weiskopf.

19

88.     The second conduct protected from retaliation was by August 2, 2015 email to Dr. Fahie where again, Dr. Brader goes into much detail regarding the abusive and disparate treatment he was enduring by Dr. Weiskopf.

89.     As a direct result of his engaging in protected conduct, Dr. Brader experienced adverse employment action.

90.     Dr. Weiskopf's discriminatory treatment of Dr. Brader only intensified after Dr. Brader's first report in July 2015.

91.     Moreover, after Dr. Brader made the aforementioned reports to Biogen management, Ms. Ballinger promised a formal sit-down meeting with Dr. Brader to discuss the issues he raised concerning Dr. Weiskopf.

92.     The date for such a meeting was first scheduled for "early October," then it was rescheduled for October 22, 2015 at Ms. Ballinger's impetus.

93.     Little did Dr. Brader know at the time, he was set to receive Biogen's termination notice on October 21, 2015, effectively terminating his employment with Biogen just one (1) day before the conveniently rescheduled meeting with Ms. Ballinger could ever take place.

94.     As further outlined herein, there is sufficient causal connection between Dr. Brader's formally lodged complaints and his pretextual termination under the guise of being included in a global workforce reduction.

95.     The temporal proximity of time between Dr. Brader lodging his formal complaints with Biogen management, the scheduling of a meeting to address his complaint for a day after he was set to be terminated, and then sending him Biogen's termination notice on October 21, 2015, permits a reasonable inference of retaliation under the law.

20

96.     Biogen cannot articulate a legitimate, non-retaliatory reason for the adverse employment action suffered by Dr. Brader.

97.     Because an employer seeks to reduce its workforce does not mean that it is free to make its employment decisions on impermissible grounds.

98.     Even during a legitimate reorganization or workforce reduction, an employer may not dismiss employees for unlawful discriminatory reasons.

99.     In terms of employment discrimination, pretext can be proven in several different ways.

100.    One way to prove pretext is by presenting evidence of disparate treatment.

101.    Here, as more fully outlined in this Verified Complaint, there is both documentary and expected testimonial evidence that Dr. Brader was singled out for discriminatory and disparate treatment by Dr. Weiskopf and Ms. Ballinger - notably *unlike* Dr. Brader's colleagues who had *not* developed the important Crystallization concept, and who were *not* "stealing the spotlight," at least from Dr. Weiskopf's perspective.

102.    Once Dr. Brader made his discriminatory abuse by Dr. Weiskopf known to Ms. Ballinger and other Biogen management, coupled with the obvious fact that Dr. Brader was suffering from a mental disability arguably triggered by Dr. Weiskopf's constant discriminatory animus, to faux schedule a sit-down meeting with Dr. Brader for the day immediately after he was set to receive Biogen's termination letter can be seen as nothing short of strong inferential proof of retaliation against Dr. Brader for engaging in protected activity; namely, complaining about the discriminatory treatment he was receiving by Dr. Weiskopf.

## COUNT III
### *Violations of Mass. Gen. Laws c. 151B*

103.   Plaintiff reasserts and incorporates the allegations of Paragraphs 1-102 of his Verified Complaint as if fully set forth herein.

104.   Based on the same allegations found in paragraphs 64-71 of this Verified Complaint, at all relevant times, Dr. Brader was a member of a protected class under Mass. Gen. Laws c. 151B on account of his mental illness.

105.   Based on the same allegations found in paragraphs 79-81 of this Verified Complaint, Dr. Brader suffered harm as a result of Biogen's discrimination against him, ultimately being terminated by Biogen.

106.   Based on the same allegations found in paragraphs 38-43 and 46-60 of this Verified Complaint, Biogen management's discriminatory animus toward Dr. Brader was clearly evident.

107.   In light of Dr. Brader's exemplary eight (8) year record with Biogen and his recent significant scientific breakthrough in the form of the Crystallization concept, there can be no other reasonable explanation for his inclusion as part of the global workforce reduction other than it arising out of discriminatory animus of Biogen toward Dr. Brader - or that such animus was otherwise a motivating factor in Dr. Brader's termination.

## COUNT IV
### *Retaliation Under Mass. Gen. Laws c. 151B, §4*

108.   Plaintiff reasserts and incorporates the allegations of Paragraphs 1-107 of his Verified Complaint as if fully set forth herein.

109.    Mass. Gen. Laws c. 151B, §4(4) makes it illegal for "any person, employer … to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter…."

110.    The elements of retaliation under Massachusetts state law are the same as the elements of retaliation under the ADA. Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, n. 6 (2002) ("[a]s Chapter 151B is considered the state analogue to the Americans with Disabilities Act (ADA), Massachusetts courts look to cases decided under the federal counterpart to inform its interpretation; we do likewise as needed.")

111.    Based on the same allegations found in  COUNT II of this Verified Complaint,  once Dr. Brader made his discriminatory abuse by Dr. Weiskopf known to Ms. Ballinger and other Biogen management, coupled with the obvious fact that Dr. Brader was suffering from a mental disability arguably triggered by Dr. Weiskopf's constant verbal abuse, to faux schedule a sit-down meeting with Dr. Brader for the day immediately after he was set to receive Biogen's termination notice can be seen as nothing short of strong inferential proof of retaliation against Dr. Brader for engaging in protected activity; namely, complaining about the discriminatory treatment he was receiving by Dr. Weiskopf.

112.    Ultimately, Dr. Brader's discharge occurring soon after he engaged in protected conduct is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation.

## COUNT V
### *Negligent Infliction of Emotional Distress*

113.    Plaintiff reasserts and incorporates the allegations of Paragraphs 1-112 of his Verified Complaint as if fully set forth herein.

114.    Biogen, by permitting the pervasive discrimination, hostile work environment, disparate treatment and retaliation further described herein against Dr. Brader by its management employees, Dr. Weiskopf and Ms. Ballinger, negligently caused Dr. Brader severe emotional distress.

115.    As further outlined in paragraphs 23-37 and 64-70 of this Verified Complaint, as a direct result of the discrimination perpetrated upon Dr. Brader by Biogen and its management, he suffered a psychotic breakdown that led to a three week in-patient mental health hospital stay.

116.    Considering that Dr. Weiskopf's unfair and sufficiently severe treatment of Dr. Brader permeated his workplace with enough discriminatory intimidation, ridicule and insult that literally altered the conditions of Dr. Brader's employment (he had to check into a mental health hospital as a result, taking a nearly four month leave of absence), it is likely that a reasonable person would have suffered emotional distress under the same or similar circumstances of this case.

117.    As a direct result of Biogen's actions and omissions, Plaintiff has suffered both compensatory and emotional harm.

118.    Plaintiff is entitled to damages as a result of Biogen's discrimination, retaliation and negligent infliction of emotional distress against Dr. Brader.

119.    Prior to filing the instant lawsuit, Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination (hereinafter "MCAD") on December 23, 2015. On March 31, 2106, the MCAD sent correspondence confirming that Plaintiff may immediately remove the matter to Superior Court pursuant to Mass. Gen. Laws c. 151B, §9.

24

**WHEREFORE, PLAINTIFFS PRAY THAT THIS HONORABLE COURT:**

1.  Issue judgment in Plaintiff's favor on all Counts;

2.  Award Plaintiff compensatory damages;

3.  Award Plaintiff punitive damages pursuant to 42 U.S.C. §1981a(b);

4.  Award Plaintiff reasonable attorneys' fees and costs, in accordance with 42

    U.S.C. §1988 and Mass. Gen. Laws c. 151B; and,

5.  Order such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

The Plaintiff,

By His Attorneys,

Jeremy Y. Weltman (662293)
**Kerstein, Coren & Lichtenstein, LLP**
60 Walnut Street
Wellesley, MA 02481
t:      (781) 997-1600
f:      (781) 997-1633
jweltman@kcl-law.com

Dated: 5/4/16

25

## VERIFICATION

I, Dr. Mark Brader, Plaintiff in the above-captioned matter, hereby certify under the pains and penalties of perjury that I have fully read the within Verified Complaint and that the facts stated therein are true and accurate to the best of my knowledge.

Mark Brader, Ph.D.

Date: 1 April 2016

26



11393

**KERSTEIN, COREN & LICHTENSTEIN LLP**

Suffolk County Sheriff's Dept.                    4/12/2016

                    Service of Summons Fee - 1681CV00988          50.00
                    Client: Brader, Mark

Citizens - Weltman          Svc of Summons fee; 1681CV00988 (Brader)          50.00