## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MARK BRADER,

    Plaintiff,

               v.

BIOGEN INC.,

    Defendant.

Civil Action No.   16-10889 (DPW)

## DEFENDANT BIOGEN INC.'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Biogen Inc. ("Biogen") submits this Memorandum of Law in Support of Its Motion for Summary Judgment.  After extensive discovery, Plaintiff has no admissible evidence that would support his statutory claims for disability discrimination and retaliation, or his claim for negligent infliction of emotional distress.[1]  Moreover, his claim for negligent infliction of emotional distress is barred by the exclusivity provision of the Workers' Compensation Act, M.G.L. c. 152, § 24 (the "WC Act").  As a result, summary judgment should be granted in Biogen's favor and this case dismissed.

## SUMMARY OF THE ARGUMENT

Plaintiff was laid off as part of a restructuring impacting 11% of Biogen's workforce. Plaintiff's testimony confirms that his claims are based on his disagreement with performance feedback he received and his attempts to blame Biogen for a mental health incident he experienced a year before he was laid off.  As set forth below, Plaintiff cannot support his legal claims when the only evidence is, in short, that Plaintiff had a longstanding disagreement with his manager about his performance and disliked the manner in which he was managed.

Plaintiff's first claim is that feedback given to Plaintiff by his manager Andrew Weiskopf regarding a June 18, 2014 presentation caused him emotional distress and, indeed, caused him to have what he described as a "psychotic breakdown."[2]  Dr. Weiskopf met once with Plaintiff to share constructive feedback regarding that presentation.  Plaintiff disagreed with the feedback, and now claims that the feedback and the manner in which it was given caused him emotional distress, yet the undisputed facts are that Plaintiff aggressively initiated and pursued numerous additional meetings with Dr. Weiskopf on this topic – long after it was clear that Dr. Weiskopf had dropped

---

[1] Discovery in this single-Plaintiff discrimination case was extensive, with five depositions taken and over 3,600 pages of documents produced.  The Court rejected Plaintiff's request for additional discovery after the close of the discovery period.  Though Plaintiff's Complaint and testimony focused on the conduct of his manager, Andrew Weiskopf, Plaintiff never noticed the deposition of Dr. Weiskopf.

[2] Biogen vigorously disputes Plaintiff's characterization of how he was managed and treated.  For purposes of summary judgment only, however, Biogen accepts Plaintiff's mischaracterizations as the evidence before the Court.

the issue.  The WC Act would bar this claim, but even if not barred, the conduct reflects nothing more than a workplace disagreement, not the negligent infliction of emotional distress.

The main focus of Plaintiff's case is what he describes as a "psychotic breakdown" on June 30, 2014.  After increasingly irrational behavior in the preceding days, Plaintiff went out on leave on July 1, 2014.  In the midst of a number of emails and meetings in which Plaintiff was generally incoherent and covered a wide range of topics, Plaintiff claimed to feel "unsafe" at work, but made no complaint of discrimination and provided no details regarding why he felt unsafe.  While numerous people at Biogen asked him about his comment that he did not feel unsafe at work and offered help, Plaintiff pointed Biogen only to the performance disagreement between he and his manager and nothing more.  Andrea Sinclair, the human resources professional who spoke to Plaintiff at this time, testified that nothing that Plaintiff shared with her indicated that he "should feel unsafe at work."  Biogen was very responsive and supportive in this situation.  Not only did Ms. Sinclair contact him to check on his welfare, and provide support, Plaintiff was eventually granted extended leave based on his medical condition following his July 1, 2014 hospitalization.

Plaintiff claims to have experienced discrimination or retaliation when he returned to work in October 2014.  The undisputed facts and Plaintiff's own testimony, however, doom any such claim.  It is undisputed that Plaintiff resumed his same position after he returned from medical leave.  Plaintiff was given every accommodation he requested.  While he claims that one project with an external collaborator was taken from him when he was on leave, the only evidence before the Court is that the project itself had evolved such that it was appropriate for another functional area to take over the work.  Even if Plaintiff was still the appropriate person to work on the project, it is certainly not unlawful for an employer to reassign work on ongoing projects when an employee, such as Plaintiff, takes an extended leave.

In the period after October 2014, Plaintiff complains that Dr. Weiskopf disagreed with Plaintiff's pursuit of his "crystallization concept" and provided negative feedback to Dr. Brader. Here, again, there is no evidence that disagreement over a project or the feedback he provided was motivated by any discriminatory animus.  Indeed, Plaintiff himself characterizes the disagreement as being motivated by "professional jealousy."

Plaintiff also bases his claims on Dr. Weiskopf's direction not to ask more than one or two questions at meetings and to "not try so hard."  Plaintiff, however, has no evidence that there was any discriminatory intent to these comments.   Here, again, Plaintiff is trying to weave a discrimination and retaliation claim from nothing more than a disagreement with his manager over routine work issues.  When pressed to provide any evidence that Dr. Weiskopf's behavior was discriminatory or based on Plaintiff's actual or perceived disability, Plaintiff testified clearly that he had no such evidence and that he had no understanding of Dr. Weiskopf's motivation.

Finally, Plaintiff's argument that he was included in the large-scale reduction in force in October 2015 because of his disability or because he had complained about Dr. Weiskopf's behavior cannot survive the undisputed facts.  Plaintiff cannot point to any protected conduct that he engaged in prior to his inclusion in the layoff nor any bias in his selection for layoff.  There is no evidence that Plaintiff engaged in any protected conduct before this decision was made.  While Plaintiff contends that he "complained" to Ms. Ballinger and another employee about Dr. Weiskopf's behavior, he admits that none of these "complaints" related to a claim that Dr. Weiskopf was discriminating against him, and, instead related solely to Plaintiff's disagreement with the performance feedback he received from Dr. Weiskopf and the manner in which Dr. Weiskopf provided that feedback.  As with his other claims, there is no evidence of discriminatory animus.  The decision to include Plaintiff in the large-scale reduction in force was made on September 9, 2017 by Alphonse Galdes.  The only evidence is that Dr. Galdes based his decision

on the business needs of Biogen and that neither Dr. Weiskopf nor Jessica Ballinger, who was Dr. Weiskopf's manager, were consulted about the decision.

## FACTUAL SUMMARY

### A.     The Parties

Plaintiff was employed by Biogen from 2007 through November 2016 as a scientist.  SOF, ¶ 5.[3]  Plaintiff reported to Dr. Dimitrova through July 2013 and then to Dr. Weiskopf in the Protein Pharmaceutical Development ("PPD") group, which was a part of Biogen's Technical Development ("TD") department.  Id., ¶ 4, 6-7.

Drs. Dimitrova and Weiskopf reported to Ms. Ballinger, the Senior Director responsible for PPD who in turn reported to Dr. Galdes, who was the Vice-President responsible for TD.  Id., ¶ 4-7.  Through October 2014 Andrea Sinclair was employed in the Human Resources Department at Biogen, and was the primary human resources employee assigned to assist the PPD group.

### B.     Plaintiff Has No Disability Or Perceived Disability Prior To June 30, 2014.

Plaintiff does not claim that he suffered from any disability or that he was perceived as disabled prior to June 30, 2014.  Id., ¶ 11.[4]

### C.     Plaintiff Claims That His Manager "Harassed" Him And Caused Him Emotional Distress By Providing Plaintiff With Feedback About A June 18, 2014 Presentation

Plaintiff made a presentation on June 18, 2014 to the PPD department and members of TD senior management.  Id., ¶ 12.  Following the presentation, Dr. Dimitrova expressed some concerns to Dr. Weiskopf about Plaintiff's presentation.  Id., ¶ 13.  Dr. Weiskopf shared Dr. Dimitrova's feedback with Plaintiff during a meeting on Friday, June 20, 2014.  Id., ¶ 14.

After this meeting, Plaintiff continued to pursue discussions with Dr. Weiskopf regarding the feedback that he had received on the presentation, asking to meet with Dr.  Weiskopf multiple

---

[3] "SOF" refers to Biogen's Local Rule 56.1 Statement of Undisputed Material Facts, submitted herewith.
[4] Plaintiff took a short leave earlier in 2014 for a back injury, which is not the subject of his disability claim.

times.  Id., ¶ 16.  Plaintiff claims that Dr. Weiskopf caused him emotional distress and "harassed"

him between June 18, 2014 through June 30, 2014 by making "objectionable statements" that

Plaintiff "couldn't understand" about his presentation when they met, and by calling his

presentation "terrible."  Id., ¶ 15.  Plaintiff testified that Dr. Weiskopf's feedback and conduct was

offensive because it insulted Plaintiff and was (in Plaintiff's view) "blatantly and obviously false."

Id., ¶ 17.  Plaintiff had no knowledge of the motivation for Dr. Weiskopf's feedback, testifying

that he could only "speculate" as to the motive.  Id., ¶ 18.

**D.      Plaintiff's June 30, 2014 "Breakdown" And Biogen's Response**

On June 29, 2014, Sunday, Plaintiff ran into Ms. Ballinger outside of work while they were

both out walking in Lexington.  Id., ¶ 19.  Ms. Ballinger, who know Plaintiff well and described

him as normally "pretty laid back" was concerned that Plaintiff was clearly agitated during the

interaction and was behaving oddly.  Id., ¶ 20.  Later that day, Plaintiff emailed both Dr. Weiskopf

and Ms. Ballinger seeking to meet yet again about the feedback he had received on his presentation.

Id., ¶ 21.  Based on Ms. Ballinger's meeting with Plaintiff on Sunday June 29, 2014 and Plaintiff's

emails that day to both Ms. Ballinger and Dr. Weiskopf, Ms. Ballinger and Dr. Weiskopf both

became concerned about Plaintiff.  Id., ¶ 22.  They informed Ms. Sinclair, as the human resources

professional for PPD, of their concerns.  Id., ¶ 23.

Plaintiff met with both Dr. Weiskopf and Ms. Ballinger on June 30, 2014, as he had

requested.  Id., ¶ 24, 31.  He met first with Dr. Weiskopf in Dr. Weiskopf's office.  Plaintiff testified

that he asked Dr. Weiskopf in this June 30, 2014 meeting to "stop harassing" him and, specifically,

objected to Dr. Weiskopf's criticisms of Plaintiff's June 18, 2014 presentation.  Id., ¶ 25.  When

Dr. Weiskopf would not agree that his criticisms of Plaintiff were "inappropriate or unfair,"

Plaintiff asked two colleagues to join the meeting, testifying:

> And I remember in front of them [the two colleagues] explaining that Dr. Weiskopf
> and myself have a disagreement about my performance or my technical

presentation, a disagreement that I am having difficulty understanding, and maybe they could help me understand what he's trying to communicate to me.

Id., ¶ 26.  Plaintiff claims that he did not feel safe during this meeting because Dr. Weiskopf would not change his criticisms of Plaintiff's June 18, 2014 presentation.  Plaintiff testified that Dr. Weiskopf did not make any movement that made him fear for his safety, but that his "body language," "hostile persona" and unwillingness to change his view on Plaintiff's presentation made Plaintiff feel unsafe and "very concerned."  Id., ¶ 27.

After meeting with Dr. Weiskopf, Plaintiff emailed Ms. Ballinger, stating that he was "good with Andy [Dr. Weiskopf]" and that he had just had a "very enjoyable conversation with Andy."  Id., ¶ 28-29.  Dr. Weiskopf, Ms. Sinclair and Ms. Ballinger met after Plaintiff's meeting with Weiskopf.  All were concerned that Plaintiff appeared agitated and discussed that they wanted Plaintiff to feel safe at work and did not understand why he did not feel safe at work.  Id., ¶ 30.

Ms. Sinclair met with Plaintiff at the Starbucks on Biogen's campus at 2:30 that same afternoon.  Plaintiff told Ms. Ballinger at this meeting that he considered Dr. Weiskopf's criticisms of his June 18, 2014 presentation as harassment.  Id., ¶ 31-32.  Again, Plaintiff testified that he did not know the reason, motivation or basis for what he characterized as this "harassment."  Id., ¶ 33. During this meeting Ms. Ballinger offered Plaintiff assistance and asked Plaintiff why he did not feel safe.  Plaintiff could not provide her with a clear response as to why he felt unsafe and Ms. Ballinger described him as agitated and jumbled during the meeting.  Id., ¶ 34.[5]

After his meeting with Ms. Ballinger, Plaintiff began to send a series of emails to Ms. Ballinger, Dr. Weiskopf and other Biogen employees on June 30 and July 1, 2014.  Id., ¶ 36-38. Plaintiff testified that he believed that he was having some type of mental health episode by this

---

[5] Ms. Ballinger testified that during the course of this meeting Plaintiff's behavior was erratic and he was making motions with his hands in his pockets that caused Ms. Ballinger to be concerned.  While Ms. Ballinger was very concerned about Plaintiff, and tried to understand why he claimed to feel unsafe, Ms. Ballinger herself was concerned about her own safety given Plaintiff's demeanor.  Id., ¶ 31.

point in time.  Id., ¶ 36.  The emails he sent at this time were generally incoherent.  Id., ¶ 37-37.

In the emails, the Plaintiff referenced a soccer game he wanted to watch, praised Biogen, demanded

to meet with its CEO to clear up any misunderstanding and included numerous *non-sequiturs*.

While certain of these emails generally stated that Plaintiff did not feel safe at work without any

further context, none of the emails complained about discrimination.  Id., ¶ 38.  To the extent they

are coherent, they suggest only that Plaintiff was focused on his disagreement with Dr. Weiskopf

over the feedback that had been given to Plaintiff about his presentation.

Ms. Sinclair spoke with Plaintiff on July 1, 2014 in an effort to understand why he did not

feel safe at work, to offer him Biogen's confidential Employee Assistance Program and to check

on him.  Id., ¶ 39, 42.  During this call, Ms. Sinclair was not able to understand from Plaintiff why

he did not feel safe at work.  Id., ¶ 40.  Plaintiff recalled that during their July 1, 2014 call, Ms.

Sinclair told Plaintiff that "she was concerned about [his] complaint that [he] didn't feel safe at

work" and was following up on that.  Plaintiff did not provide any specific examples or incidents,

but instead responded to Ms. Sinclair that he disagreed with performance feedback that he had

been given by Dr. Weiskopf and Ms. Ballinger:

> I explained to her that what they were doing grossly violated the Biogen Idec core
> values: honesty, integrity and respect for others.  And I told her I wanted to make a
> formal complaint to HR, that their behavior, in my opinion, was against Biogen
> policy and that she needed to do something about it.

Apart from stating his purported belief that his managers violated policy, he never articulated what

comments or behaviors supposedly violated policy nor provided any facts to support his belief.

Plaintiff testified that "what they were doing" referred to the following alleged conduct by Ms.

Ballinger and Dr. Weiskopf:

> One of the reasons that I was so distraught about the way that Dr. Weiskopf was
> interacting with me and the malicious way that he was characterizing my
> performance in my June 18th presentation, I was very worried that he and Jessica
> Ballinger were basically conspiring to diminish my performance to the point where
> they would get rid of me.

Id., ¶ 41.  Ms. Sinclair was able to confirm with Plaintiff's wife that he had been hospitalized.[6]

**E.     Plaintiff's Leave And Return To Work At Biogen In October 2014**

      1.     Plaintiff's Return To Work

Plaintiff was on a medical leave from July 1, 2014 through October 26, 2014.[7]  Plaintiff met with Ms. Sinclair on the day he returned to work.  Plaintiff requested, and was permitted, to use vacation time when he initially returned to work so that he was not working a full schedule immediately.  Plaintiff made no other request for accommodation when he returned to work, and his doctor certified that he could return to work with "no restrictions."  Id., ¶ 53.  Plaintiff returned to his same position, compensation and responsibilities after his leave.  Id., ¶ 54.

Plaintiff did not make any complaint about feeling unsafe at work or about discrimination or harassment when he returned to work.  Id., ¶ 55.  While he was out on leave, one project that Plaintiff was working on (for Avia Biosystems) had moved to another group while he was out and Plaintiff did not work on this project when he returned.  Id., ¶ 56.

---

[6] On July 7, 2014, while hospitalized, Plaintiff sent two other rambling and generally incoherent emails to a lengthy list of Biogen employees, including the CEO.  The nature of these emails is even more disjointed than the earlier emails.  Similar to the earlier emails, these email are also full of incoherent *non sequiturs*, including talk about his son's Death Star lego and provides a bulleted list with one entry simply reading "Ghandi."  In addition to the confused language, these emails also asked for Biogen's assistance, commented that Plaintiff just wanted to "go back to my normal job," and did not reference feeling unsafe at work or any claim of harassment or discrimination.  Id., ¶ 45.

[7] Biogen uses a third party vendor to manage medical leaves.  No Biogen employee received information from a medical care provider regarding the cause of Plaintiff's behavior in late June and early July 2014.  The only specific medical information given to Biogen regarding what had happened to Plaintiff at this time came from Plaintiff's wife, who told Ms. Sinclair in an email three weeks after his symptoms started that an infection had caused Plaintiff's behavior, and that his behavior was part of a temporary issue:

> The doctors have identified after [Plaintiff's] back surgery, he had a terrible infection and consequently, had an acute reaction to the medications he was put on…causing havoc on every level!  Thank goodness this is all 'temporary'

Plaintiff's health care provider supported the information given by Plaintiff's wife when, in completing Biogen's Disability and Accommodation Questionnaire, he noted that the "impairment began following back surgery."  Ms. Sinclair, Dr. Galdes and Ms. Ballinger all understood that Plaintiff's behavior in late June and early July 2014 was, as his wife indicated, caused by a temporary infection and that Plaintiff had recovered fully from this infection when he returned to work.  Prior to this lawsuit, Plaintiff never shared with any of them that he had a mental health issue.  Id., ¶ 48-49.

2.      Plaintiff's Pursuit Of His "Crystallization Concept" And Claims That He Was
        "Harassed" By Dr. Weiskopf With Respect To This Idea

In or about March 2015 Plaintiff began to pursue what he believed was a novel "crystallization concept."  Id., ¶ 57.  Plaintiff continued to explore this idea, and received support and funding for this idea from his managers, until his employment with Biogen ended.  Id., ¶ 58.

Plaintiff testified that the conduct that formed the basis of his discrimination and retaliation claims was his removal from the Avia Biosystems project and feedback from Dr. Weiskopf, including allegedly calling Plaintiff's crystallization concept "stupid," and telling Plaintiff not to ask so many questions in meetings and not to try so hard.  Id., ¶ 59.  Plaintiff testified that Dr. Weiskopf's conduct was motivated by "professional jealously."  Id., ¶ 61.  Other than these comments and the comments about his performance described above, Plaintiff did not identify any specific comments that were made to him after he returned to work in October 2014 that he considered to be harassment or discrimination, or to have caused him distress.  Id., ¶ 59-63.

Plaintiff received his mid-year review in or about late July or early August 2015, which contained certain criticisms, but also noted areas where he had performed well.  Id., ¶ 62.  Plaintiff testified that he did not complain about discrimination at this time and that, while he felt Dr. Weiskopf's review was not accurate, he did not know what Dr. Weiskopf's motivation was for the allegedly inaccurate review.  Id., ¶ 63.

Plaintiff contends that he "complained" about Dr. Weiskopf several times, including to Ms. Ballinger in July, August and September 2015 and to Brian Fahie, another Biogen employee who was not Plaintiff's supervisor.  Id., ¶ 64-70.  A review of the emails that include these "complaints" and Plaintiff's testimony about the complaints reveal that Plaintiff did not complain to either Ms. Ballinger or Mr. Fahie about *discrimination*, or even make any complaint that could be construed as a complaint about discrimination.  Id.  Instead, Plaintiff complained about Dr. Weiskopf's feedback and how Dr. Weiskopf was presenting that feedback.  Id.

**F.      Plaintiff Is Laid Off As Part Of A Large Reduction In Force And Restructuring**

Dr. Galdes was involved in a team across Biogen that planned for a major restructuring of the company in 2015, known internally as "Gemstone," and was responsible for deciding how his division would implement the restructuring.  Id., ¶ 71-73.  Dr. Galdes was responsible for identifying a list of employees in PPD who would be laid off as part of the company's restructuring and reduction in force (the "Gemstone list") and he alone decided to include Plaintiff on the Gemstone list.  Id., ¶ 74.  Dr. Galdes included Plaintiff on the Gemstone list no later than September 9, 2015.  Id., ¶ 75.  Plaintiff was included on the Gemstone list because Dr. Galdes concluded that Biogen did not need the roles for either Plaintiff or his post-doctoral student, whose positions were dedicated specifically to new innovations and biologics.  Id., ¶ 77.  Dr. Galdes did not discuss the decision to include Plaintiff on the Gemstone list with Ms. Ballinger or Dr. Weiskopf until the decision was being implemented in October 2015.  Id., ¶ 79.

Plaintiff's "mental breakdown" was not discussed in any way when Dr. Galdes was determining whether or not Plaintiff should be included on the Gemstone list, and was not considered by Dr. Galdes in making the decision to include Plaintiff on the Gemstone list.  Id., ¶ 80.  Plaintiff was notified on October 22, 2015, on the same date as most other impacted employees, that his employment with Biogen would end on November 6, 2015.  Plaintiff has no knowledge of who made the decision to include him in the Gemstone list or when that decision was made.  Id., ¶ 76.

## ARGUMENT

**A.      Plaintiff Has No Admissible Evidence Supporting His Claims**

To defeat summary judgment, Plaintiff bears the burden of presenting admissible evidence sufficient for a jury to return a verdict in his favor.  See Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990) (summary judgment should be granted if evidence is merely colorable or is not significantly

probative, summary judgment may be granted); Barbour v. Dynamics Research Corp., 63 F.3d 32, 3 (1st Cir. 1995) (party opposing summary judgment cannot rest on allegations or pleadings).  As set forth below, Plaintiff has no met his burden on his claims.

**B.     Plaintiff's Claim For Negligent Infliction Of Emotional Distress Is Barred By The WC Act**

As a matter of law, Plaintiff cannot recover against his employer, Biogen, on a claim for negligent infliction of emotional distress.  Such a claim is barred by the exclusivity provision of the Massachusetts Workers' Compensation Statute.  M.G.L. ch. 152 § 24 (the "WC Act").[8]

The WC Act provides the exclusive remedy when Plaintiff can show he has suffered a personal injury and that injury arose out of the course of his employment.  LaValley v. Quebecor World Book Servs. LLC, 315 F. Supp. 2d 136, 149 (D. Mass. 2004) (quoting Foley v. Polaroid Corp., 381 Mass. 545, 548-49 (1980)); McCarty v. Verizon New Eng., Inc., 731 F. Supp. 2d 123, 129 (D. Mass. 2010) (barring emotional distress claims based on actions of plaintiff's supervisor including negative performance reviews).

There is no question here that Plaintiff was a Biogen employee at the time of the alleged injury.  Because Plaintiff's claim for negligent infliction of emotional distress seeks to recover for personal injuries (emotional distress) "within the meaning" of the WC Act that arose "out of and in the course of" Plaintiff's employment, these claims are barred by the exclusivity provision of the WC Act and should be dismissed.

1.     Plaintiff's Injuries Are Personal Injuries "Within The Meaning" Of The WC Act

Plaintiff claims he suffered "severe emotional distress" requiring a "three week in-patient" hospital stay. This would clearly constitute a personal injury "within the meaning" of the WC Act, thereby barring an employee's recovery for a common law claim.  Complaint, ¶¶ 114-15; see

---

[8] Plaintiff moved to amend the Complaint to add a claim for intentional infliction of emotional distress as well.  Though the Court denied Plaintiff's motion, such a claim would likewise be barred by workers' compensation exclusivity.

Foley, 381 Mass. at 549-50 (dismissing claim of intentional infliction of mental distress because it was barred by the exclusivity provision of the WC Act); Brown v. Nutter, McLennen & Fish, 45 Mass. App. Ct. 212, 215 (1998) (same)

     2.    Plaintiff's Injuries Arose Out Of And In The Course Of His Employment

As the injuries alleged in Plaintiff's Complaint are personal injuries "within the meaning" of the WC Act, the only remaining question is whether these injuries are shown to have arisen 'out of and in the course of ... employment.'" Foley, 381 Mass. at 548-49. "'An injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of employment; in other words, out of the employment looked at in any of its aspects.'" Doe, 422 Mass. 563, 566 (1996) (emphasis supplied) (finding that the sexual assault of an employee during store work hours on the employer's premises "arose out of the employment" within the meaning of the statute."), quoting Caswell's Case, 305 Mass. 500, 502 (1940); Brown, 45 Mass. App. Ct. at 215 ("criterion – that the injury arise from the employment – is to be broadly construed." dismissing claim for intentional infliction of emotional distress as barred by the WC Act).

Here, Plaintiff affirmatively alleges that his emotional distress and, indeed, his "psychotic breakdown" were caused by Biogen.  Putting aside the complete lack of evidence to support that spurious claim, Plaintiff cannot escape the fact that his sole allegation is that the circumstances of his employment with Biogen caused the emotional distress he alleges to have suffered.  As a result, his claim for negligent infliction of emotional distress is barred by the exclusivity provision of the WC Act, and should be dismissed.  Foley, 381 Mass. at 550 (claim for intentional infliction of emotional distress barred by exclusivity provision of the WC Act).

**C.**    **No Reasonable Person Would Suffer Emotional Distress On The Facts Alleged Here**

To avoid summary judgment on his claim for of negligent infliction of emotional distress, Plaintiff must show that a reasonable person would have suffered emotional distress under the

same circumstances.  Sorenson v. H&R Block Inc., 2002 U.S. Dist. LEXIS 18689, at *56-57 (D. Mass.) (granting summary judgment because there was no objective harm nor would a reasonable person have suffered emotional distress in the circumstances alleged); DiMare v. RealtyTrac, Inc., 714 F. Supp. 2d 199, 211 (D. Mass. 2010) (same).  If a reasonable person in the Plaintiff's situation would have been merely angry, upset or disappointed, Plaintiff's claim for negligent infliction of emotional distress must fail.  Vasquez v. Potter & Co., 2007 Mass. App. Div. 26, 30 (Mass. App. Ct.) (granting summary judgment when even in the worst case scenario a reasonable person would have been angry, annoyed or upset).

Here, what Plaintiff alleges caused him emotional distress does not rise beyond the level of a typical work-place disagreement.  Plaintiff takes issue with what he believes was unfair feedback he received from Dr. Weiskopf, including comments that his crystallization idea was "stupid," that he should not "try so hard" and that he should only ask one or two questions at meetings.  While Plaintiff may have been angry, upset or disappointed, the conduct Plaintiff describes would not cause a reasonable person to suffer emotional distress.  To find otherwise would transform every feedback conversation, performance coaching or routine workplace disagreement into the basis for a claim of negligent infliction of emotional distress.  Accordingly, this claim should be dismissed.

## D.    Plaintiff Has No Evidence Of Discrimination[9]

In order for Plaintiff to make out a *prima facie* discrimination claim under either state or federal law, he must prove that (1) he suffers from a disability or handicap; (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation; and (3) the defendant took an adverse employment action against him because

---

[9] Plaintiff does not assert that there was any failure to accommodate his disability.  To the contrary, he conceded at his deposition that Biogen accommodated his only request for a part-time schedule, i.e., that when he returned he be permitted to work three days only and use vacation time for the other two days.

of, in whole or in part, his protected disability.  See Freadman v. Metro. Prop. & Cas. Ins. Co., 484

F.3d 91, 99 n.7 (1st Cir. 2007).  Claims of disability discrimination under either federal or state

law are evaluated according to the familiar burden-shifting framework outlined by the Supreme

Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this approach, the

Plaintiff must first establish a *prima facie* case.  Assuming the *prima facie* case is met, the burden

then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment

decision and to produce credible evidence to show that the reason advanced was not pretextual.

Id.  Finally, if the defendant offers such a reason, the burden shifts back to the Plaintiff, and he

must proffer evidence to establish that Biogen's non-discriminatory justification is mere pretext,

cloaking discriminatory animus.  Id. at 804.   The ultimate burden of proving unlawful

discrimination rests at all times with the Plaintiff.  Reeves v. Sanderson Plumbing Prods., Inc., 530

U.S. 133, 143 (2000).

    For purposes of summary judgment, Biogen will not dispute that Plaintiff can satisfy the

first two elements of his claim, or that he has established his *prima facie* case.  The evidence before

the Court, however, makes it clear that Biogen has established a legitimate, non-discriminatory

reason for its employment decisions and that Plaintiff cannot establish that Biogen's justification

for its decisions is mere pretext.

    The only two adverse employment actions identified by Plaintiff as evidence of

discrimination are its decision to transition the responsibility for the Avia Biosystems collaboration

to another employee while Plaintiff was on medical leave in 2014 and its decision to include

Plaintiff in the layoff list more than a year later.  Plaintiff has no evidence that either of these were

the result of unlawful discrimination.

    Prior to his leave, Plaintiff had worked on a project with an external collaborator, Avia

Biosystems.  While Plaintiff was on leave, Biogen moved the work to another area as the work

had "evolved" and the "appropriate functional leader should own it."  Even if the work could have continued with Plaintiff had he not been on leave, it would have been entirely reasonable for Biogen to permanently transition this project to another employee to accommodate Plaintiff's lengthy medical leave.  Indeed, Biogen's ability to transition work to another employee is part of what made Plaintiff's leave a "reasonable accommodation."  Plaintiff testified that he **did not know** why Biogen transitioned him from this collaboration, and could only speculate that it was because of his "mental health."  This speculative testimony is not evidence that Biogen transitioned the work for any retaliatory or discriminatory reason.  Moreover, while Plaintiff points to this as an adverse action, there is no evidence that there was any negative impact on Plaintiff as a result of this project being transitioned from him.  He cites no decrease in his compensation or his title as a result, and he never complained to anyone about this issue prior to his termination.

Plaintiff also has no evidence supporting the claim that his termination was discriminatory. It is undisputed that Plaintiff was included in a large reduction-in-force that resulted in Biogen laying off 11% of their work force.  Plaintiff admits that he had no knowledge of who made the decision to include him in this lay off and why.  The **only** evidence before the Court, therefore, is that Dr. Galdes made the decision to include Plaintiff in the Gemstone list no later than September 9, 2015 and that he did so for a legitimate business reason without reference to Plaintiff's alleged "breakdown" in June 2014.[10]

What remains is only Plaintiff's subjective belief that his inclusion in the Gemstone list related to a disability or perceived disability.  This is insufficient to satisfy Plaintiff's burden on summary judgment, as "[p]roof of more than [Plaintiff's] subjective belief that he was the target of discrimination, however, is required" to survive summary judgment.  Mariani-Colon v. Dep't

---

[10] Indeed, Dr. Galdes testified clearly that he did not believe that Plaintiff had suffered anything more than an infection and that he was fully recovered when he returned to work.

15

of Homeland Sec., 511 F.3d 216, 222 (1st Cir. 2007) (finding Plaintiff could not meet third-stage burden when he could not present more than speculation that his termination was a result of discriminatory animus); Santiago v. Canon U.S.A., 138 F.3d 1, 5-6 (1st Cir. 1998) (granting summary judgment when the Plaintiff could only rely on conclusory assessments that comments by company representatives demonstrated discriminatory intent); Quinones v. Houser Buick, 436 F.3d 284, 290-91 (1st Cir. 2006) (finding that suspicions of discrimination cannot be used as evidence and that his unsupported speculations could not create a triable issue of material fact).

**E.    Plaintiff's Retaliation Claim Fails Because He Never Engaged In Protected Conduct**

Claims for unlawful retaliation are analyzed under the same burden-shifting framework applicable to employment discrimination claims.  Rodriguez v. Boehringer Ingelheim Pharms., Inc., 425 F.3d 67, 84 (1st Cir. 2005).  As with his discrimination claims, Plaintiff has the burden of establishing a *prima facie* case of retaliation, i.e., "that he engaged in protected conduct, that he suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action.'" See Mole v. Univ. of Massachusetts, 442 Mass. 582, 591 (2004), quoting Mesnick, 950 F.2d at 827; see also Tate v. Dept. of Mental Health, 419 Mass. 356, 364 (1995) (citing standard).  If Plaintiff meets that showing, the burden shifts to Biogen to articulate a legitimate reason for the adverse action.  See Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 36 (1st Cir. 2010).  Plaintiff must then prove pretext.

As an initial matter, Plaintiff's purported "protected conduct" is clearly nothing more than his disagreement with feedback he received.  Putting aside his complaint that he did not feel safe at work, which is addressed below, Plaintiff points to statements he made to Ms. Ballinger, including by email, and discussions and an email sent to Mr. Fahie (with the email being sent using non-Biogen email), another Biogen employee who was not Plaintiff's supervisor, as his "protected activity."  In none of these "complaints" did Plaintiff make an actual complaint of discrimination

or harassment.  Indeed, the evidence (and even Plaintiff's allegations) make it clear that he never complained about anything other than a disagreement with his supervisors over his feedback prior to his termination.  Plaintiff did not engage in protected activity and thus cannot establish a *prima facie* case.

Even if Plaintiff can establish that he engaged in protected conduct, he cannot establish that he suffered retaliation as a result.  The primary "adverse action" identified by Plaintiff is his inclusion in the Gemstone list.  As set forth above, Plaintiff has no evidence contradicting Biogen's position that Biogen was included in this list for a legitimate business purposes.  Discovery has eliminated Plaintiff's argument that he was included in this list after he "complained" to Ms. Ballinger on September 29, 2015.  Not only has the evidence shown that this "complaint" did not reference any form of discrimination, it is clear that the decision to include Plaintiff in the Gemstone list **had already been made** by Dr. Galdes well before September 29, 2015 with no input from Dr. Weiskopf or Ms. Ballinger.

Plaintiff cannot prove retaliation was the motivation for Biogen's decision to transition him from the Avia Biosystems project either, as set forth above.  See Karatihy v. Commonwealth Flats Development Corp., 84 Mass. App. Ct. 253, 255 (2013) citing McCormack v. Boston Edison Co., 423 Mass. 652, 662 n.11 (1996) (mere fact that one event followed another is insufficient to prove causal connection necessary to sustain retaliation claim).

Other than the above "adverse actions" Plaintiff complains of nothing more than performance disagreements with his supervisors, which he characterizes as "harassment" but is unable to connect to any discriminatory animus.  Indeed, he concedes either that he does not know the motivation for his supervisors to criticize his performance or he believed it to be "professional jealousy"; neither reason supports a claim of retaliation or unlawful discrimination of any kind. Significantly Plaintiff also stated that he was treated the same by Biogen both before he allegedly

17

became disabled or perceived to be disabled on June 30, 2104 and after he returned from leave.  If the crux of Plaintiff's claim is that he was treated badly by his manager, the fact that the treatment was **the same before and after he became disabled**, precluding any argument that the cause of the alleged "harassment" was motivated by or in response to Plaintiff's disability.   Without evidence that any alleged protected conduct caused an adverse action, his claim for retaliation fails.

F.      **Biogen Responded Properly To Plaintiff's Vague Complaint That He Felt Unsafe At Work**

Biogen anticipates that Plaintiff will argue that his claims are based, in part, on his contention that Biogen had an obligation to "investigate" statements he made around the time of his "breakdown" that he did "not feel safe at work."   Plaintiff both misstates Biogen's legal obligation and mischaracterizes Biogen's conduct.

The anti-discrimination statutes do not impose on employers an obligation to investigate a safety complaint.  Plaintiff's statement that he felt "unsafe" cannot be construed as a complaint of discrimination.   In his own testimony, Plaintiff concedes that he has little recall of saying he felt unsafe.  He also testified that, when asked by Ms. Sinclair to articulate his concerns about feeling unsafe at work, he told her that his general concern related to his supervisors' handling of a performance issue. Plaintiff never cited any specific statements by his supervisors or examples of mistreatment.   Plaintiff cites no case law supporting a legal claim resulting from an employer's failure to investigate a workplace performance disagreement of this nature or even a claim regarding safety.  See Estrella Medina–Rivera v. MVM, Inc., 713 F.3d 132, 138 (1st Cir. 2013) (duty to investigate not triggered when employee complains about harassment generally, without information suggesting that the harassment was related to gender or another protected category); Chaloult v. Interstate Brands Corp., 540 F.3d 64, 75-76 (1st Cir. 2008) (voluntary adoption by employer of company that requires more than what the law allows does not increase the employer's legal liability).

Moreover, Plaintiff cannot claim that he suffered any adverse action as a result of Biogen's failure to investigate.  Immediately after Plaintiff alleged that he did not feel safe at work, Plaintiff requested and was granted a four-month medical leave.[11]  Indeed, during this leave, Ms. Sinclair and Plaintiff's wife exchanged numerous emails in which Plaintiff's wife expressed her gratitude for Biogen's "continual support and understanding" and thanking Biogen for "everything that [it] had done to help" Plaintiff and his wife.  SOF, ¶ 44-50.

Plaintiff returned to work at Biogen in October 2014, at which time Ms. Sinclair met with Plaintiff to address any concerns he had about his return to work.  Other than a request to initially work a temporary part time schedule, which Biogen granted, Plaintiff made no other requests, identified no workplace concerns, and never again commented that he felt unsafe at work.

Finally, while Plaintiff takes issue with Biogen's response to his complaint that he felt unsafe at work, he ignores Biogen's response to this concern.  Ms. Sinclair met with Plaintiff to try and understand his concerns and to provide him with resources to help him address the concerns.  Ms. Sinclair also reassured Plaintiff that Biogen wanted him to feel safe at work and that he could stay home until the issue was addressed.  Ms. Sinclair emailed and called Plaintiff specifically to follow-up on this concern, again offer him resources and assure him that he did not have to return to work if he felt unsafe.  Crediting Plaintiff's view of his conversation with Ms. Sinclair, he reported nothing unsafe at work other than his performance disagreement with his supervisors.  Plaintiff identified no physical threat during his call with Ms. Sinclair and admits that he was not communicating coherently at this time.

After Ms. Sinclair's attempts to understand Plaintiff's concern, Plaintiff was hospitalized, and his wife informed Biogen that his erratic behavior had been caused by a medical condition that

---

[11] This leave was in addition to medical leave taken by Plaintiff earlier in the year.  Plaintiff's earlier leave was related to the back surgery referenced in his wife's email.

was being treated and would likely be fully resolved.  Far from ignoring Plaintiff's concerns, Biogen sought to understand, provided benefits (paid medical leave) to help his recovery, met with him upon his return, and permitted a part-time work schedule. There were no other complaints about the managers' behavior.  Plaintiff, by contrast, never articulated a factual basis for his statements about feeling unsafe, which furthermore were made during what he calls a "psychotic breakdown" characterized by numerous incoherent and nonsensical statements that Plaintiff now claims he cannot remember. Biogen responded appropriately and certainly did not run afoul of any legal obligation to investigate.  There is no basis to suggest that Biogen had a legal obligation to do more.

## **CONCLUSION**

For the foregoing reasons, Biogen's Motion for Summary Judgment should be granted, and Plaintiff's Complaint dismissed.

Dated: October 20, 2017                    Respectfully submitted,

                                           BIOGEN INC.

                                           By its attorneys,

                                           */s/ Sarah B. Herlihy*
                                           Jeffrey S. Brody (BBO No. 566032)
                                           Email: brodyj@jacksonlewis.com
                                           Sarah B. Herlihy (BBO No. 640531)
                                           Email: sarah.herlihy@jacksonlewis.com
                                           JACKSON LEWIS P.C.
                                           75 Park Plaza, 4th Floor
                                           Boston, MA  02116
                                           Tel: (617) 367-0025
                                           Fax: (617) 367-2155

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non registered participants on October 20, 2017.


/s/ Sarah B. Herlihy
Jackson Lewis P.C.

4833-8237-9601, v. 3