UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


MARK BRADER,                    )
                               )
            Plaintiff,         )        CIVIL ACTION NO.
                               )        16-cv-10889-DPW
v.                             )
                               )
BIOGEN INC.,                   )
                               )
            Defendant.         )


<u>MEMORANDUM AND ORDER</u>
March 4, 2019

Plaintiff Dr. Mark Brader brings this suit against his former employer, Biogen Inc., alleging disability discrimination and negligent infliction of emotional distress. Discovery having been completed, Biogen Inc. now moves for summary judgment.

## I. BACKGROUND

### A. *Factual Background*

#### 1. <u>Relevant Parties</u>

Defendant, **Biogen Inc.,** is a pharmaceutical company that develops, markets, and manufactures therapies for people living with serious neurological, autoimmune, and other rare diseases.

Alphonse Galdes was employed by Biogen as the Senior Vice President of the Technical Development ("TD") department in Biogen's Pharmaceutical Operations and Technology ("PO&T") division. In that role, Dr. Galdes oversaw several Biogen

groups, including the Protein Pharmaceutical Development ("PPD") group.

Jessica Ballinger was employed by Biogen as a Senior Director responsible for PPD. She reported directly to Dr. Galdes. Andrew Weiskopf was employed by Biogen as a Director in PPD and reported to Ms. Ballinger.

Andrea Sinclair was employed in the Human Resources ("HR") department at Biogen and was the HR employee primarily assigned to provide HR support to the PPD.

Plaintiff, **Dr. Mark Brader,** worked for Biogen from October 8, 2007 until November 6, 2015. He was employed as a Principal Scientist in PPD. Dr. Weiskopf was his direct supervisor from July 2013 until his employment with Biogen ended. Dr. Brader's previous supervisor was Mariana Dimitrova.

### 2. Biogen's Policies

Biogen provides its employees with a document entitled "Values in Action Code of Business Conduct" ("Code"). The document instructs employees to "[p]romptly report concerns about possible violations of laws, regulations, this Code and policies to your supervisor" as one of every employee's responsibilities. Responsibilities for managers include that "[n]o matter who the allegation involves, [the manager] must report it without exception." The Code also states, in its "Harassment-free workplace" section, that all employees "have

the right to work in an environment that is free from intimidation and harassment."

Biogen also provides its employees with a Non-Discrimination and Non-Harassment Policy ("Policy").  The Policy states that "Biogen is committed to providing a workplace free of unlawful harassment and discrimination.  The document provides that "[s]upervisors and managers must immediately report any alleged or perceived incidents or discrimination or harassment (whether or not the incident occurs in his or her area of responsibility)."

Both the Code and the Policy set forth a non-retaliation policy.  The Code states that Biogen does not tolerate "[t]hreatening, intimidating, coercing, or retaliating against those who report their concerns – anywhere, anytime, for any purpose."  The Policy provides that "Biogen will not knowingly permit any retaliation against any employee who complains in good faith, of discrimination or harassment or who participates in an investigation.  It is a violation of this Policy, and unlawful, to retaliate against [such] employee."

Biogen has a separate "ADA Non-Discrimination and Accommodation Policy" ("ADA Policy") that states "Biogen is committed to fulfilling its obligations under the Americans with Disabilities Act ("ADA") and it is the Company's policy to hire, train, promote, compensate, and administer all employment

practices without regard to disability.  Discrimination against job applicants or employees because they are disabled is prohibited and will not be tolerated by Biogen."

Biogen also maintains a Global Investigations Protocol ("GIP") setting forth its "procedures for the reporting, evaluation, and tracking of matters that potentially require internal investigation by Biogen Idec or its affiliates and sets forth guidelines for the conduct and documentation of resulting internal investigations."  The GIP "applies to matters involving potential violations of law, Biogen Idec's Code of Conduct, or other significant internal policies by Biogen Idec personnel or individuals acting on Biogen Idec's behalf."

3.  <u>Dr. Brader's June 18, 2014 Presentation and its Feedback</u>

On June 18, 2014, Dr. Brader gave a presentation to the PPD group.  The presentation was a technical review showcasing the work he and his team had accomplished over the previous years.  Dr. Brader's presentation was mostly comprised of slides that he had previously presented both internally at Biogen and externally.  Dr. Brader was especially focused on this presentation because while he was on leave for back surgery, Dr. Weiskopf informed him that TD senior management would be in

attendance.[1]  At the same time, Dr. Brader was aware that he was being considered for a promotion to director.

Following the presentation, Dr. Brader's former manager, Dr. Dimitrova, expressed some concerns to Dr. Weiskopf about Dr. Brader's presentation.  Dr. Weiskopf shared Dr. Dimitrova's feedback with Dr. Brader during a meeting on Friday, June 20, 2014.  Dr. Brader claims that Dr. Weiskopf made "objectionable statements" that he "couldn't understand" about his presentation when they met, calling his presentation "terrible," and stating that Dr. Brader's presentation had insulted PPD and Dr. Dimitrova and was used inappropriately to present Dr. Brader's personal views and agenda.  Dr. Brader further states that Dr. Weiskopf's comments were absurd and nonsensical, leaving him bewildered and confused by this sudden and malicious criticism.

Dr. Brader asked Dr. Weiskopf to meet to discuss the feedback several times between their initial meeting on June 20, 2014 and June 30, 2014, and, in fact, met with Dr. Weiskopf multiple times during this period.  Dr. Brader characterized Dr. Weiskopf's feedback with respect to his June 18, 2014 presentation as "harassment."  He testified that Dr. Weiskopf's feedback and conduct was offensive because it insulted him and was, in his view, "blatantly and obviously false."  When he was

---

[1] TD senior management did not attend the presentation on June 18, 2014.

asked what he thought was Dr. Weiskopf's motivation, Dr. Brader testified that he did not know and that he could only "speculate" as to Dr. Weiskopf's motivation. He also testified that he was unaware of Ms. Ballinger's motivations during this time period.

### 4.    Dr. Brader's Concerning Behavior

In the weeks following his presentation, Dr. Brader's wife began to notice negative changes in his mental health. On Sunday, June 29, 2014, Dr. Brader ran into Ms. Ballinger and her husband, who is also employed at Biogen, during a walk in Lexington, where they both live. Ms. Ballinger was concerned that Dr. Brader was not "himself" during this interaction and it appeared there was "something not right" with him. Later that day, Dr. Brader emailed both Dr. Weiskopf and Ms. Ballinger seeking to meet further with them about the feedback he had received regarding his presentation. Based on her encounter and the emails Dr. Brader later sent to both Ms. Ballinger and Dr. Weiskopf, Ms. Ballinger became concerned about Dr. Brader. The next day, Ms. Ballinger and Dr. Weiskopf informed Ms. Sinclair about their concerns with Dr. Brader's behavior.

### 5.    Meetings on June 30, 2014

Dr. Brader met with Dr. Weiskopf on the morning of June 30, 2014. This meeting was requested by Dr. Brader. During the meeting, Dr. Brader asked Dr. Weiskopf to "stop harassing" him

and, specifically, objected to Dr. Weiskopf's criticisms of his June 18, 2014 presentation. When Dr. Weiskopf would not agree that his criticisms of Dr. Brader were "inappropriate or unfair," Dr. Brader asked two colleagues to join the meeting. Dr. Brader indicated to the two colleagues that he and Dr. Weiskopf were having "a disagreement about [his] performance or [his] technical presentation, a disagreement that [he was] having difficulty understanding," and he wanted their help in "understand[ing] what [Dr. Weiskopf was] trying to communicate to [him]."

Dr. Brader claims that he did not feel safe during this meeting because Dr. Weiskopf would not change his criticisms of his presentation. Dr. Brader testified that while Dr. Weiskopf did not make any movement that made him fear for his physical safety, his "body language," "hostile persona," and unwillingness to change his view on Dr. Brader's presentation made Dr. Brader feel unsafe and "very concerned."

After meeting with Dr. Weiskopf, Dr. Brader emailed Ms. Ballinger. Shortly thereafter, around 2:30 PM, Dr. Brader met with Ms. Ballinger at the Starbucks on Biogen's campus. Ms. Ballinger described Dr. Brader as "agitated" and jumbled and noticed that he kept putting his hands in and out of his pockets. Dr. Brader told Ms. Ballinger that he considered Dr. Weiskopf's criticisms of his presentation as harassment,

including the "way [Dr. Weiskopf] chose to conduct [his] performance review and the way in which he communicated to [him]." Dr. Brader testified that he did not know the reason, motivation, or basis for what he characterized as Dr. Weiskopf's "harassment" of him. During the meeting, Ms. Ballinger asked Dr. Brader why he did not feel safe, but Dr. Brader could not provide her with a clear response. After the meeting, Ms. Ballinger reported on what had happened during the meeting to Ms. Sinclair. At Ms. Sinclair's request, Ms. Ballinger emailed Dr. Brader to confirm information on the employee assistance program and to connect him with Ms. Sinclair to follow-up on any concerns about feeling safe at work.

### 6. Emails from Dr. Brader

After his meeting with Ms. Ballinger, Dr. Brader began to send a series of emails to Ms. Sinclair, Ms. Ballinger, Dr. Weiskopf, and other Biogen employees on June 30 and July 1, 2014. Dr. Brader testified that he believed by this point that he was having some type of mental health episode. The emails sent were, for the most part, incoherent. Certain of the emails generally stated that Dr. Brader did not feel safe at work.

On June 30, 2014, at 4:45 PM, Dr. Brader sent an email to Ms. Sinclair. At 4:52 PM, he sent an email to Ms. Ballinger and Dr. Weiskopf. In these emails, he stated that he does not feel safe at work. He sent an email to Ms. Sinclair at 5:31 PM. The

email is full of incomplete thoughts and is unclear.  Two
minutes later, at 5:33 PM, he sent another email to Ms.
Sinclair, indicating that it was his first "normal" email of the
day.  Within thirty seconds, he sent another email to Ms.
Sinclair with only a subject line that read "I do not feel safe
at work."  In response to this email, Ms. Sinclair sent an email
to Dr. Brader at 5:50 PM.  In that email, Ms. Sinclair referred
Dr. Brader to Biogen's Employee Assistance Program.  She
included, "It is important that our employees feel safe at
work."

        While he was emailing Ms. Sinclair, Dr. Brader was also
responding to an email sent by an external collaborator at New
York University.  He told the external collaborator that he had
"a small HR issue right now to deal with."  When he was further
pressed on the issue by the external collaborator, Dr. Brader
responded that he "told [his] supervisor that [he did not] feel
safe."  [Id.].  He copied Ms. Sinclair in that email.  In
response, Ms. Sinclair sent an email to Dr. Brader, copying Ms.
Ballinger, requesting that they "connect tomorrow before [he]
respond[s] to further e-mails."

        On that same day at 9:38 PM, Dr. Brader sent a reply to Ms.
Sinclair and copied Dr. Weiskopf, Dr. Galdes, and Ms. Ballinger.
Dr. Brader claimed he "need[ed] to get a message to [Biogen's
Chief Executive Officer ("CEO")]" and that he was "upset."  A

few minutes later, at 9:55 PM, Dr. Brader sent an email to Dr. Weiskopf, Dr. Galdes, Ms. Sinclair, and Ms. Ballinger and copied several Biogen employees. The email was directed to Dr. Galdes. At 11:14 PM, Dr. Brader sent another email to Ms. Sinclair but copied several other Biogen employees, including Ms. Ballinger and Dr. Weiskopf. He again requested to meet with Biogen's CEO and indicated that he was "not feeling 100."

On July 1, 2014, at 3:01 AM, Dr. Brader sent an email to Dr. Weiskopf and copied Ms. Sinclair and two additional Biogen employees, including Brian Fahie, Dr. Brader's "mentor." In this email, Dr. Brader indicated that he would "see a mental health professional asap" and that he had "been described as mentally unstable by [his] supervisor and senior director." At 7:24 AM, Dr. Brader sent Dr. Galdes an email. He noted that "there is something terribly wrong with PPD." He further indicated that he recently sought "treatment for possible PTSD." Dr. Brader also stated that he would "plead insanity."

In response to Ms. Sinclair's email to him at 7:43 AM indicating that she would call his home phone or cell phone at 8 AM, he sent an email at 7:54 AM and copied Dr. Weiskopf. In this email, Dr. Brader stated that he was "directly called crazy by [his] senior director." He also wrote that he was "unusually angry, but calm." At 10:41 AM, Dr. Brader sent an email to Ms. Sinclair, Dr. Galdes, and Dr. Weiskopf, copying Ms. Ballinger

and several other Biogen employees.  The email listed 41 bullet points, the first one which included, "Yes I retruly [sic] am wondering whether I have a mental health issue."

Ms. Sinclair spoke with Dr. Brader on July 1, 2014 in an effort to understand why he did not feel safe at work.  Dr. Brader responded to Ms. Sinclair that he did not feel safe at work because of a dispute over performance feedback that he had been given by Dr. Weiskopf and Ms. Ballinger.  Ms. Sinclair offered Dr. Brader Biogen's confidential Employee Assistance Program.  Eventually, Ms. Sinclair was able to speak to Dr. Brader's wife, who confirmed that Dr. Brader had been hospitalized.  On the morning of July 1, 2014, Dr. Brader's wife emailed to express her appreciation for Ms. Sinclair's assistance.

On July 7, 2014, while hospitalized, Dr. Brader sent two other largely incoherent emails to a lengthy list of Biogen employees.  These emails asked for Biogen's assistance and stated that he was "scared."  Dr. Brader did not mention the words "harassment" or "discrimination" in these emails.  Rather, his focus remained on the feedback he received on June 18, 2014 concerning his presentation.

### 7.   Dr. Brader's Medical Leave

Dr. Brader was on medical leave from July 1, 2014 to October 26, 2014.  Biogen uses a third party vendor to manage

medical leave.  No Biogen employee received information from a medical care provider regarding the cause of Dr. Brader's behavior in late June and early July 2014.  The only specific medical information given to Biogen regarding what had happened to Dr. Brader at this time came from Dr. Brader's wife, who told Ms. Sinclair three weeks after his symptoms started that an infection had caused Dr. Brader's behavior, and that his behavior was part of a temporary issue.  Dr. Brader's health care provider supported the information given by his wife: in completing Biogen's Disability and Accommodation Questionnaire ("DAQ") for Dr. Brader's July to October 2014 leave, the provider noted that the "impairment began following back surgery."

Ms. Sinclair, Dr. Galdes, and Ms. Ballinger understood that Dr. Brader's behavior in late June and early July 2014 was, as his wife indicated, caused by a temporary infection and that he had recovered fully from his infection when he returned to work. Prior to this lawsuit, Dr. Brader never stated to any of them that he had a broader mental health issue.  Dr. Brader's health care provider also supported the conclusion that his illness was temporary and that he had fully recovered when, in completing the DAQ, he noted that "upon return" Dr. Brader would have "no restrictions."

<u>8.</u>  <u>Dr. Brader's Return to Work in October 2014</u>

Dr. Brader met with Ms. Sinclair on the day he returned to work.  He requested, and was permitted, to use vacation time when he initially returned to work so that he was not working a full schedule immediately.  He made no other request for accommodation.  Dr. Brader returned to his same position, compensation, and responsibilities.  He did not make any complaint about feeling unsafe at work or about discrimination or harassment when he returned to work.

Prior to his leave, Dr. Brader had worked on a project with an external collaborator, Avia Biosystems ("the Avia Project"). While Dr. Brader was on leave, the Aviva Project was moved to another group and Dr. Brader did not return to this project after his medical leave.

Around March 2015, Dr. Brader began to pursue what he believed was a novel "crystallization concept."  He continued to explore this idea, and received support and funding for it, until his employment with Biogen ended.

Dr. Brader testified that the conduct that formed the basis of his present suit was his removal from the Avia Biosystems project and feedback from Dr. Weiskopf, including statements allegedly calling his crystallization concept "stupid," and telling Dr. Brader not to ask so many questions in meetings and not to try so hard.  Notably, Dr. Brader contends that Dr.

Weiskopf's inappropriate treatment of him started before he became disabled (or came to be perceived as disabled) on June 30, 2014. Dr. Brader testified that Dr. Weiskopf's response to his crystallization concept was "disingenuous" because Dr. Weiskopf was not a subject matter expert in this area. He testified that he thought Dr. Weiskopf's conduct could be motivated by "professional jealously" and "a desire to take undue credit" for Dr. Brader's work.

Dr. Brader received his 2015 mid-year review in late July or August 2015. Dr. Brader testified that he did not complain about discrimination during this period of time and that, while he felt Dr. Weiskopf's review was not accurate, he did not know what Dr. Weiskopf's motivation was for the allegedly inaccurate review. Dr. Brader contends that he complained to Ms. Ballinger about Dr. Weiskopf in April 2015 regarding "Dr. Weiskopf's conduct" toward him. In this April 2015 discussion, Dr. Brader told Ms. Ballinger that Dr. Weiskopf told him that he was "trying too hard" and thinks he also spoke to her about Dr. Weiskopf restricting the number of questions he could ask. Dr. Brader claims that he complained to Ms. Ballinger about Dr. Weiskopf in a July 31, 2015 email. The email referenced was sent when Ms. Ballinger was on vacation and requests Ms. Ballinger's help "understanding the performance expectations [Dr. Weiskopf] sets for [Plaintiff]." Ms. Ballinger responded

to his email on her return from vacation. Dr. Brader sent
another email on August 11, 2015 to Ms. Ballinger and Dr.
Weiskopf detailing suggestions for Dr. Weiskopf to improve his
"managerial effectiveness." Both Ms. Ballinger and Dr. Weiskopf
responded on August 20, 2015, with Dr. Weiskopf stating that he
was "committed to working together with [Dr. Brader] to help him
be successful and to strengthen [their] working relationship."

Dr. Brader testified that he complained to Mr. Fahie,
another Biogen employee, starting in May 2015, about the fact
that Dr. Weiskopf told him not to try too hard and about the
August 2015 mid-year review. Mr. Fahie was not Dr. Brader's
supervisor and Dr. Brader did not report to him directly. Dr.
Brader testified that he complained to Mr. Fahie that Dr.
Weiskopf's criticism of him was "very bizarre" and contrary to
Biogen's "core values."

On September 29, 2015, Dr. Brader met with Ms. Ballinger
and presented her with a two-page document outlining his
concerns with the mid-year performance feedback and his position
that his mid-year review was not accurate. The document that he
handed Ms. Ballinger did not reference harassment or
discrimination; nor did it mention that he felt unsafe at work.

9.   Dr. Brader's Termination

Dr. Galdes was involved in a Biogen team that planned for a
major restructuring of the company in 2015, and was responsible

for deciding how the TD department would implement the restructuring.  He was first told on August 6, 2015 that there would be a reduction in force as part of the restructuring.  The reduction in force was confidential prior to its public announcement and was given the code name "Gemstone."  Dr. Galdes was one of only about twenty people — out of a workforce of approximately 8,000 worldwide — who were told about the restructuring at this time.  Dr. Galdes testified that he was responsible for identifying a list of employees in PPD who would be laid off as part of the company's restructuring and reduction in force (the "Gemstone list").  He further testified that he alone decided to include Dr. Brader on the Gemstone list.

Dr. Galdes included Dr. Brader on the Gemstone list no later than September 9, 2015.  Dr. Brader asserts he has no knowledge of who made the decision to include him in the Gemstone list or when that decision was made.  Dr. Galdes included Dr. Brader on the Gemstone list because Biogen did not need either him or his post-doctoral student, whose positions were dedicated specifically to new innovations and biologics. Dr. Galdes testified that he did not consider Dr. Brader's "mental breakdown" in any manner when he was determining whether or not Dr. Brader should be included on the Gemstone list.

Dr. Galdes did not discuss the decision to include Dr. Brader on the Gemstone list with Ms. Ballinger or Dr. Weiskopf

until the decision was being implemented in October 2015. Dr. Brader was notified on October 22, 2015, on the same date notice was provided to most other impacted employees, that he was included on the Gemstone list and that his employment with Biogen would end on November 6, 2015.

## B.    *Procedural Background*

Dr. Brader, filed his verified complaint in this matter in Massachusetts Superior Court on April 7, 2016. On May 16, 2016, Biogen removed this action to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. §§ 1331 and 1441(c)(1)(A) because Dr. Brader asserted federal claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq*..

On October 20, 2017, Biogen filed a motion for summary judgment on all claims asserted in the complaint. Dr. Brader opposed the motion on November 22, 2017.

In response to Dr. Brader's submissions opposing summary judgment, Biogen filed a motion to strike several affidavits filed by Dr. Brader on the basis that the affidavits contained statements that were not based on the personal knowledge of the affiants, constituted inadmissible hearsay, or were otherwise inadmissible.

At a hearing on May 2, 2018, I denied the motion to strike and outlined the uses for which I would make use of that

evidence in connection with summary judgment protocol. I also allowed further submissions on the question of the appropriate statute of limitations. Dr. Brader filed his supplemental memorandum on May 16, 2018 and Biogen filed its response on May 23, 2018.

Now, having had the benefit of both a hearing and supplemental submissions, I will grant Biogen's motion for summary judgment.

## II. STANDARD OF REVIEW

It is well established that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers* v. *Fair*, 802 F.2d 140, 143 (1st Cir. 1990). Having successfully done so, "the burden shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the opponent." *Id*. The nonmoving party "may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue." *Id*. (quoting *Brennan* v. *Hendrigan,* 888 F.2d 189, 191 (1st Cir. 1989)). The facts set forth are viewed in the light most favorable to the nonmoving party,

"drawing all reasonable inferences in plaintiff's favor." *Smith*
v. *Stratus Comput., Inc*., 40 F.3d 11, 12 (1st Cir. 1994).

## III. ANALYSIS

### A. The Discrimination Claims

In his complaint, Dr. Brader brings two claims under the
ADA – one for discrimination and one for wrongful retaliation –
and two identical claims under the parallel state statute,
M.G.L. c. 151B. Broadly speaking, all four claims allege that
Biogen discriminated against, and improperly terminated, Dr.
Brader because of his disability. Because all four claims rest
on the same set of factual allegations, have nearly identical
elements, and may be defeated by the same set of affirmative
defenses, I will address these four claims together.

#### 1. Statute of Limitations

After a hearing on May 2, 2018, I permitted the parties to
submit supplemental memoranda regarding Biogen's contention that
Dr. Brader's substantive claims are barred by the statute of
limitations. I now find that, while his termination was an
adverse employment action within the statute of limitations, any
alleged discriminatory acts taking place before the spring of
2015 fall outside the limitations period.

Under the ADA, "a claimant who seeks to recover for an
asserted violation . . . first must exhaust administrative
remedies," either by filing a charge with the Federal Equal

Employment Opportunities Commission ("EEOC") or "with an appropriate state or local agency, within the prescribed time limits." *Bonilla* v. *Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 278 (1st Cir. 1999); *see also Rivera-Diaz* v. *Humana Insurance of Puerto Rico*, 748 F.3d 387, 390 (1st Cir. 2014) ("The first component [of the enforcement provision of the ADA] contemplates the filing of an administrative charge within either 180 or 300 days of the offending conduct, depending on the particular jurisdiction in which the charged conduct occurs."). A plaintiff's failure to first file with either EEOC or, in the case of Massachusetts, with the Massachusetts Commission Against Discrimination ("MCAD") "if unexcused, bars the courthouse door" as such a filing "is a prerequisite to the commencement of suit." *Bonilla*, 194 F.3d at 278.

Massachusetts law imposes an identical exhaustion requirement; a plaintiff "may maintain a civil action only if she has previous filed a timely complaint with the Massachusetts Commission Against Discrimination." *Christo* v. *Edward G. Boyle Ins. Agency, Inc.*, 525 N.E.2d 643, 644 (Mass. 1988) (citing M.G.L. c. 151B § 9). For a complaint to be timely, it must be filed with MCAD within 300 days of the alleged unlawful conduct. 804 C.M.R. § 1.10(2).

Here, Dr. Brader does not contest that much of the conduct underlying his claim – Biogen's failure to promote him in 2014,

his removal from the Avia Project, and any failure to investigate claims of harassment in 2014 – fall outside the 300-day limitations period.[2]  Instead, Dr. Brader argues that my consideration of this conduct is not time-barred because it constitutes part of a continuing violation.  Alternatively, he argues that the statute of limitations should be tolled either because he could not reasonably have discovered the violation until he was terminated or under the doctrine of equitable tolling.  I address, and reject, each argument in turn.

### a. The Continuing Violation Doctrine

Both federal and state law recognize that, when a violation of anti-discrimination law is continuous, the administrative body with which the original complaint is filed (and by extension, a court) may consider conduct that occurred outside the 300-day limitations period.  However, federal and state courts differ with respect to the scope of this exception.

Federal courts have consistently held that "the statute [here, the ADA], precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period" but allows the EEOC and courts to consider "the

---

[2] Dr. Brader filed his complaint with MCAD on December 23, 2015, roughly two months after he was terminated as part of Biogen's reduction in force.  Therefore, at least the portion of his claims that focuses on his termination in October 2015 is properly before me and is not time barred.

entire scope of a hostile work environment" to inform its decision. *Nat'l Railroad Passenger Corp.* v. *Morgan*, 536 U.S. 101, 105 (2002). If the alleged violation "occurs in the wake of some continuing policy, itself illegal, then the law does not bar a suit aimed at the employer's dogged insistence upon that policy within the prescriptive period," even in the absence of a discrete violation within the statutory period. *Thornton* v. *United Parcel Service, Inc.*, 587 F.3d 27, 33 (1st Cir. 2009). However, "a mere series of discriminatory acts motivated by discriminatory animus cannot [itself] be a systemic violation" in the absence of a discriminatory policy." *Id.; see also Sabree* v. *United Brotherhood of Carpenters and Joiners Local No. 33*, 921 F.2d 396, 399-400 (1st Cir. 1990).

Under this standard, Mr. Brader's federal claims that rest on conduct taking place in 2014 are time-barred. Biogen's decisions not to promote Dr. Brader and to remove him from the Avia Project during his leave of absence are both discrete incidents that fall outside the 300-day limitations period. Similarly, while Dr. Brader's statements that he was being harassed and felt unsafe at work may indicate a continuing violation, there is no evidence that Biogen's alleged failure to investigate and act was part of a discriminatory policy that is, in and of itself, a violation of law.

The standard applied by the Commonwealth, however, is more

sympathetic to plaintiffs. For the continuing violation rule to apply under Massachusetts law, there must be "(1) at least one discriminatory act [that] occurred" within the 300-day limitations period; (2) the alleged discriminatory act must have "a substantial relationship to the alleged untimely discriminatory acts;" and, (3) the earlier violations were such that they "did not trigger [the plaintiff's] awareness and duty to assert his rights." *Ocean Spray Cranberries, Inc.* v. *Mass. Com'n Against Discrimination*, 808 N.E.2d 257, 266-67 (Mass. 2004). When the claim is based on an allegation that the harassment created a hostile work environment, Massachusetts courts have held that the limitations period begins to run when the plaintiff knew that her employer would not take steps to remedy the harassment, rather than when she had notice that she had an actionable claim. *Cuddyer* v. *Stop & Shop Supermarket Co.*, 750 N.E.2d 928, 942 (Mass. 2001).

Even this lower standard is not met here. While Dr. Brader certainly alleged that at least one wrongful act – his termination – took place within the limitations period, he has not shown that his termination had any relationship, much less a substantial one, to the alleged misconduct in 2014. There is no evidence in the record that Biogen's decision to terminate Dr. Brader was influenced by his 2014 breakdown, or that the individuals responsible for making the decision to terminate him

23

were aware of the fact that he continued to have concerns about his mental health after his return from leave in October 2014. At most, Dr. Brader can argue that he did not know that Biogen would not act to remedy the alleged harassment until after he returned from his leave of absence in October 2014. However, he has provided no evidence on record that Biogen was aware of the fact that he faced ongoing harassment because of his disability until after the decision to terminate Dr. Brader was made.[3]

Consequently, I find no evidence that the violation was continuous such that the alleged misconduct that took place in 2014 is actionable.

### b. The Discovery Rule

Dr. Brader also argues that the statute of limitations should be tolled under the so-called "discovery rule," which states that "a particular cause of action does not begin to [accrue] until the plaintiff knows, or should have known, that she has been harmed by the defendant's conduct." *Silvestris* v.

---

[3] Dr. Brader alleges that he received a poor mid-year review from his supervisor, Dr. Weiskopf, in June or July 2015 and was consistently criticized by Dr. Weiskopf prior to that, in the spring of 2015. He also alleges that he spoke to Ms. Ballinger in both April 2015 and in July 2015 about Dr. Weiskopf's conduct, though Dr. Weiskopf indicated in August 2015 that he was committed to working with Dr. Brader to remedy the situation. While this series of conversations may suggest an ongoing violation, they already fall within the 300-day statutory period and may be considered as part of Dr. Brader's discrimination claim.

*Tantasqua Regional School Dist.*, 847 N.E.2d 328, 336 (Mass. 2006); *see also Delaware State College* v. *Ricks*, 449 U.S. 250, 259 (1980) (recognizing the same rule in cases alleging employment discrimination under federal law). Here, Dr. Brader alleges that he could not reasonably have known that Biogen was discriminating against him because of his disability until he was ultimately terminated in October 2015.

This argument is unpersuasive. Dr. Brader certainly was aware of the fact that Biogen failed to promote him and subsequently removed him from the Avia Project in October 2014. He also should have known that his supervisor's behavior had not changed once he returned from leave in October 2014. He could have complained at that time. Consequently, Dr. Brader has not shown that his claims relating to conduct taking place in 2014 should be allowed under the discovery rule.

### c. Equitable Tolling

Finally, Dr. Brader argues that the statute of limitations should be equitably tolled because his mental illness prevented him from filing a timely claim. Though Dr. Brader's reluctance to confront his employer is to some degree understandable, it is not sufficient to invoke the doctrine of equitable tolling, especially in the absence of an allegation that Biogen intentionally concealed information or that Dr. Brader did not understand the nature or effects of his actions. *See e.g.*,

*Andrews* v. *Arkwright Mutual Insurance Co.*, 673 N.E.2d 40, 41
(Mass. 1996) (rescript); *Desando* v. *Lucent Technologies*, 193
F.Supp.2d 358, 361 (D. Mass. 2002).

Consequently, only Dr. Brader's claim that he was
improperly terminated in October 2015 is timely, and will be
considered on the merits.

<u>2.</u>   <u>Notice and Biogen's Duty to Investigate</u>

In anticipation of Dr. Brader's arguments in opposition to
its motion for summary judgment, Biogen contends that it was not
given notice of Dr. Brader's claims for harassment and
discrimination and therefore, had no legal obligation to
investigate or respond.

For an employer to be held liable under the ADA, it is not
enough for a plaintiff to show that he suffered harassment, "no
matter how severe or pervasive." *Medina-Rivera* v. *MVM, Inc.*,
713 F.3d 132, 138 (1st Cir, 2013).  He also "had to say
something to put [the employer] on notice [both that he was
experiencing harassment] and that the complained-of harassment
was [disability]-based." *Id.* (establishing a notice requirement
for cases brought for sexual harassment under Title VII); *see
also Roman-Oliveras* v. *Puerto Rico Elec. Power Authority*, 655
F.3d 43, 51 (1st Cir. 2011) ("[T]he statutory scheme and
language of Title I of the ADA and Title VII [of the Civil
Rights Act] are identical in many respects . . . [G]iven the

parallel statutory language . . . we think it apparent that Congress intended these two employment discrimination provisions to be read uniformly.").[4]

In this context, I conclude that, even if Biogen had notice of harassment (of which I am skeptical), it did not have notice that the harassment was based on Dr. Brader's disability. Dr. Brader had to say something to put Biogen on notice that the complained-of harassment was based on his disability, but his own testimony indicates that he did not make those specific complaints. Most of his complaints involved the feedback that he received from Dr. Weiskopf. When Ms. Sinclair asked for a clarification about why he felt unsafe at work, he did not provide her with an explanation. In any event, Ms. Sinclair provided him resources to help him address his concerns. When he was hospitalized, Mrs. Brader informed Ms. Sinclair that his behavior may have been caused by an infection after his back surgery and that it would likely be resolved. Moreover, when Dr. Brader returned to work after his three to four month medical leave, his only request was that he be permitted to work a part-time work schedule. He was accommodated in response to his request.

---

[4] Taking my direction from the First Circuit on this matter, I will also look to precedent governing cases brought under Title VII of the Civil Rights Act to inform my decision in this case.

Dr. Brader has provided arguments based on Biogen's HR policies and procedures for complaints for harassment and his main arguments revolve around what those policies allegedly require Biogen to undertake when receiving such complaints. He states that the only plausible reason Ms. Sinclair did not take his complaints seriously was on account of his mental disability at the time. Furthermore, Dr. Brader asserts that Ms. Sinclair's decision was in direct conflict with Biogen policies that require her to report or investigate Dr. Brader's concerns. Although the alleged violation of Biogen's HR policies is arguably problematic, these assertions do not bolster Dr. Brader's discrimination and retaliation claim and do not give weight to his pretextual arguments.

### 3. The Discrimination Claims

In arguing its motion for summary judgment on the merits, Biogen contends both that it acted without the requisite animus and that it has established a legitimate, nondiscriminatory reason for its employment decisions and that Dr. Brader cannot establish that Biogen's justification for its decisions is mere pretext.

The ADA "prohibits discrimination against 'a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment.'" *Freadman* v. *Metro. Prop. & Cas. Ins. Co.,* 484

F.3d 91, 99 (1st Cir. 2007) (quoting 42 U.S.C. § 12112(a)).

Massachusetts law carries a similar prohibition, *see* M.G.L

c. 151B § 4,[5] and both Dr. Brader's state and federal

discrimination claims are appropriately analyzed under the

three-part test developed in *McDonnell Douglas Corp.* v.

*Green,* 411 U.S. 792 (1973).

It is well settled that, to establish a prima facie case of

disparate treatment, a plaintiff must show: "(1) [he] suffers

from a disability or handicap, as defined by the ADA; (2) [he]

was nevertheless able to perform the essential functions of

h[is] job, either with or without reasonable accommodation; and

(3) the defendant took an adverse employment action against

h[im] because of, in whole or in part, h[is] protected

disability." *Freadman,* 484 F.3d at 99 n. 7. If the plaintiff

is able to establish a prima facie case, "the burden then shifts

---

[5] Importantly, Massachusetts law and the ADA differ with respect
to their scope, and with respect to the definition of a
"handicap." *Compare* M.G.L. c. 151B §§ 1 (5), (16), and (17)
*with* 42 U.S.C. §§ 12102, 12111(5). Beyond these differences,
however, Massachusetts courts frequently look to the standards
imposed by federal law – whether the ADA or Title VII of the
Civil Rights Act – when interpreting M.G.L. c. 151B. *See e.g.*,
*Labonte* v. *Hutchins & Wheeler*, 678 N.E.2d 853, 856 n. 5 (Mass.
1997); *Wheatley* v. *American Telephone & Telegraph Co.*, 636
N.E.2d 265, 268 (Mass. 1994) ("It is our practice to apply
Federal case law construing the Federal anti-discrimination
statutes in interpreting G.L. c. 151B."). Consequently, I will
address the elements of the state and federal claim
simultaneously, and will distinguish the state and federal
claims only when state law diverges from federal law.

to the defendant to 'articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason.'" *Id.* at 99 (quoting *Tobin* v. *Liberty Mut. Ins. Co.,* 433 F.3d 100, 105 (1st Cir. 2005)). If the defendant is able to do so, "the burden then shifts back to the plaintiff to 'proffer evidence to establish that [the defendant's] non-discriminatory justification is mere pretext, cloaking discriminatory animus.'" *Id.* (quoting *Tobin,* 433 F.3d at 105).

Notwithstanding this burden-shifting framework, "the burden of proving unlawful discrimination rests with the plaintiff at all times." *Id.* "Proof of more than [plaintiff's] subjective belief that he was the target of discrimination . . . is required." *Mariani-Colon* v. *Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 222 (1st Cir. 2007).

For purposes of the motion for summary judgment now before me, Biogen does not dispute that Dr. Brader can satisfy the first two elements of his claim – that he suffers from a disability or a handicap, as those terms are defined in both federal and state law, and that he was able to perform the functions of his job. It does, however, argue that Dr. Brader does not show that he was discriminated against *because of* his disability. Biogen further argues that it had a legitimate,

non-discriminatory reason for terminating his employment that is not pretextual.

For the sake of deciding the present motion, I will assume that Dr. Brader suffers from a disability or handicap and that he was, nevertheless, able to perform the essential functions of his job, either with or without reasonable accommodation.  I cannot, however, agree with Dr. Brader that Biogen took an adverse employment action against him because of, in whole or in part, his protected disability or that Biogen's reasoning for its actions was pretextual.  Since these two elements dovetail with one another, I consider them together.

Although Dr. Brader has listed several discriminatory actions taken against him in his opposition memorandum, the two adverse employment actions that he has identified that may potentially qualify as evidence of discrimination are the following: Biogen's decision to transition the responsibility for the Avia Project to another employee while Dr. Brader was on medical leave in 2014 and its decision to include Dr. Brader in the layoff list pursuant to its reduction in force in 2015.  As I have concluded in Section III.A. *supra*, while only the termination is within the statute of limitations, I will consider the Avia Project as evidence to the degree it provides support for a finding that the termination was discriminatory.

Dr. Brader was out on medical leave from July 2014 until October 2014.  In order to accommodate both him and the external collaborator, Avia Biosystems, it was reasonable for Biogen to have another employee continue work with Avia Biosystems.  It is hard to imagine such a project being placed in suspension due to the absence of one employee.  Furthermore, there is no evidence that there was any negative impact on Dr. Brader as a result of this project being transitioned to someone else.  He speculates that he did not get promoted as a result, but such speculation, in the absence of any record evidence, is not sufficient.  Indeed, Dr. Brader does not allege that his pay was cut or that he was otherwise demoted or prevented from working on future collaborations.  His only objection is that he was removed from a specific project while on medical leave.[6]

More fundamentally, it is undisputed that Dr. Brader was included in a large reduction in force that resulted in Biogen's laying off a significant portion of its work force.  The reduction in force was confidential prior to its public announcement and was given the code name "Gemstone."  Dr. Galdes did not discuss the decision to include Dr. Brader on the Gemstone list with Ms. Ballinger or Dr. Weiskopf until the decision was being implemented in October 2015.  He included Dr.

---

[6] There is also no indication in the record that Dr. Brader asked to return to the Avia Project and that his request was denied.

Brader on the Gemstone list no later than September 9, 2015.
Dr. Galdes testified that he included Dr. Brader on the Gemstone
list because Biogen did not need either him or his post-doctoral
student, whose positions were dedicated specifically to new
innovations and biologics.  Based on this evidence, it is clear
both that Dr. Brader has not shown that he was discriminated
against *because of* his disability and that Biogen met its burden
of articulating a legitimate, non-discriminatory reason for both
Dr. Brader's transition out of working with Avia Biosystems and
his termination.

Dr. Brader also cannot establish that Biogen's
justification for its decisions was mere pretext.  No doubt Dr.
Brader's colleagues and supervisors, as a result of his actions
and emails during the relevant time period, could surmise that
he was not acting as he normally would and that something was
wrong.  Dr. Brader maintains that he was being harassed because
of his mental illness, and, that as a result, he felt unsafe at
work.  He characterized Dr. Weiskopf's feedback with respect to
his June 18, 2014 presentation as "harassment," but when he was
asked what he thought Dr. Weiskopf's motivation was for his
actions in 2014, Dr. Brader testified that he did not know and
that he could only "speculate" as to Dr. Weiskopf's motivation.
In a meeting with Dr. Weiskopf on the morning of June 30, 2014,
Dr. Brader asked Dr. Weiskopf to "stop harassing" him and,

specifically, objected to Dr. Weiskopf's criticisms of his presentation.  Furthermore, when asked why he did not feel safe, Dr. Brader could not provide a clear response.

In further support of his arguments, Dr. Brader points to Biogen's HR policies, which establish a supervisor's responsibilities when any alleged or perceived incidents or discrimination or harassment are reported to them.  He also offers evidence that Biogen has a known history of conducting an investigation when an employee tells them they do not feel safe, and that it failed to investigate here.

However, both Ms. Sinclair and Ms. Ballinger, on several occasions, directed Dr. Brader's attention to Biogen's employee assistance program.  Notably, in her affidavit in support of Dr. Brader, Ms. Moore asserts that Biogen's HR policies "must be adhered to in letter and spirit in order to prevent unlawful actions, inappropriate conduct, threatening behavior, and/or a hostile work environment to permeate the Biogen workplace, among other things."

Dr. Brader's complaints, especially in the beginning, did not raise a concern of unlawful or inappropriate behavior.  Rather, they primarily concerned Dr. Weiskopf and his comments about Dr. Brader's presentation.  The only potentially alarming information he relayed to Biogen during the relevant time period was that he felt unsafe.  When asked to clarify, his responses

were usually incoherent.  To be sure, the incoherence of his emails strongly supports his claim that there was something wrong with Dr. Brader.  However, that is not enough to support the proposition that Dr. Brader's disability was the motivation for Ms. Ballinger's and Dr. Weiskopf's treatment of him.

Dr. Brader also speculates that a decision to promote him was made in June 2014, before he had a disability, and was then revoked after he became disabled.  He cites Ms. Sinclair's notes from September 2014 that reference a June 19, 2014 promotion meeting.  These notes, however, do not state that a decision had been made to promote Dr. Brader in June 2014, but rather that the matter was discussed.  More specifically, the notes do not support the inference that Biogen declined to promote Dr. Brader because of his disability.

Moreover, Biogen's decision to reassign the Avia Biosystems project to another Biogen employee when Dr. Brader was on medical leave was appropriate in light of the circumstances.  The affidavits submitted by Dr. Brader from the Avia Biosystems cofounder and Dr. Brader's post-doctoral student that Dr. Brader provided do not support the conclusion that Biogen's decision was based on Dr. Brader's disability.

Lastly, Dr. Brader makes much of the fact that he only spent 15% of his time on new technology advancement and innovation, the area of work in which Biogen no longer wanted to

invest.  This he observes was less than the 20% that another
Biogen employee dedicated to continuing Dr. Brader's research
after he was let go.  But Dr. Brader fails to acknowledge that
instead of having two employees, one of whom worked 15% of his
time on new technology advancement and innovation, Biogen was
left with one employee who arguably spent 20% of his time on new
technology advancement and innovation.  Consideration of job
functions is not inherently suspect.  I do not find Dr. Brader's
reliance on these percentages particularly illuminating when
considering whether Biogen's decision to terminate him was
pretextual.

Therefore, I will grant summary judgment to Biogen on the
discrimination claims.

### 4.   Retaliation Claims

With respect to the retaliation claim, Biogen argues that
Dr. Brader did not engage in protected activity and, even if he
did, Dr. Brader cannot establish that he suffered retaliation as
a result.

The ADA's retaliation provision provides that "[n]o person
shall discriminate against any individual because such
individual has opposed any act or practice made unlawful by this
chapter." *Freadman*, 484 F.3d at 106 (quoting 42 U.S.C.
§ 12203(a)).  A "plaintiff may assert a claim for retaliation
even if [he] fails to succeed on a disability claim." *Freadman*,

484 F.3d at 106 (quoting *Soileau* v. *Guilford of Me., Inc.,* 105 F.3d 12, 16 (1st Cir. 1997)).

Claims for unlawful retaliation are analyzed under the same burden-shifting framework applicable to employment discrimination claims. *Kelley* v. *Correctional Medical Services, Inc.*, 707 F.3d 108, 115 (1st Cir. 2013). Accordingly, "to make out a prima facie retaliation claim, the plaintiff must show that (1) [he] engaged in protected conduct; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action.'" *Kelley*, 707 F.3d at 115; *see also Mole* v. *Univ. of Mass.*, 814 N.E.2d 329, 338-39 (Mass. 2004) (quoting *Mesnick* v. *Gen. Elec. Co.,* 950 F.2d 816, 827 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992)) (holding that a plaintiff must establish the same three elements to succeed on a claim for retaliation under M.G.L. c. 151B). "Once a plaintiff makes out a prima facie case of retaliation, 'the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision.'" *Carreras* v. *Sajo, Garcia & Partners*, 596 F.3d 25, 36 (1st Cir., 2010) (quoting *Wright* v. *CompUSA, Inc.,* 352 F.3d 472, 478 (1st Cir. 2003)). If the employer provides a legitimate reason for its decision, the burden shifts back to the plaintiff to show that the motive was retaliatory. *Id.*

Under both state and federal law, "protected activity" includes opposing unlawful employment practices, filing a complaint, or testifying or assisting in a proceeding before either the EEOC or MCAD. *See* M.G.L. c. 151B § 4(4); 42 U.S.C. § 2000e-3(a). Requesting an accommodation is also protected conduct. *Freadman*, 484 F.3d at 106. Certainly Dr. Brader's request to use his vacation days constitutes protected activity under this standard. It is more difficult, however, to establish that his complaints to Ms. Sinclair and Ms. Ballinger about Dr. Weiskopf do as well, especially since the record shows only that these complaints centered on Dr. Brader's disagreement with his supervisors about feedback he received for his presentation.

Even if these conversations constituted protected conduct, the record does not show a causal nexus between this conduct and his termination when I am satisfied that Biogen has provided a legitimate non-retaliatory reason for its decision to terminate him. In particular, I find that, as with Dr. Brader's discrimination claim, he has not adequately alleged here that the adverse employment action – his termination – was related in any way to his complaints about his supervisor or any other protected conduct. *See supra*. This is especially true since Dr. Brader asserts that his supervisor treated him in the same way both before and after he was disabled.

Consequently, I will grant summary judgement to Biogen with respect to Dr. Brader's retaliation claim.

## B. *Negligent Infliction of Emotional Distress Claim*

In addition to his discrimination claims under both federal and state law, Dr. Brader also brings a claim for common-law negligent infliction of emotional distress. In its motion for summary judgment, Biogen argues that this claim is precluded by the Massachusetts Workers' Compensation Act ("MWCA") and, in any event, should fail on the merits.

I address each argument in turn.

### 1. Preclusion

As a preliminary matter, Biogen argues that Dr. Brader cannot recover on a claim for negligent infliction of emotional distress because the common-law claim is foreclosed by the MWCA. M.G.L. c. 152 § 24. Specifically, "common law actions are barred where: 'the plaintiff is shown to be an employee; his condition is shown to be a personal injury within the [MWCA's meaning]; and the injury is shown to have arisen out of and in the course of . . . employment.'" *LaValley* v. *Quebecor World Book Servs. LLC*, 315 F. Supp. 2d 136, 149 (D. Mass. 2004) (citing *Foley* v. *Polaroid Corp.,* 413 N.E.2d 711, 713-14 (Mass. 1980)).

In particular, "where 'mental harm is the essence of the [claim],' it is an indispensable ingredient, and the claim is

barred." *Green* v. *Wyman-Gordon Co.*, 664 N.E.2d 808, 814 (Mass. 1996) (citing *Foley*, 413 N.E.2d at 716). However, where "'physical or mental harm is incidental, and is not an indispensable ingredient' of the claim," the underlying common law claims survive. *Id.*, citing *Foley*, 413 N.E.2d at 716.

Here, Dr. Brader was a Biogen employee when the conduct giving rise to this claim took place, and his claims for negligent infliction of emotional distress are covered by the MWCA. *LaValley*, 315 F. Supp. 2d at 149 ("[C]laims for negligent infliction of emotional distress are covered by the MWCA."). Although claims for violation of civil rights are not compensable under the MWCA and thus are not barred, *Green,* 664 N.E.2d at 814, the claim for negligent infliction of emotional distress is separate from, and brought in addition to, his civil rights claims.

Consequently, the mental harm alleged here is not merely incidental; rather, it is the core of Dr. Brader's claim for relief. Furthermore, it is undisputed that Dr. Brader's claim arose "out of and in the course of employment," resulting, namely, from the treatment of his supervisors. Dr. Brader's claim for negligent infliction of emotional distress therefore is barred by the exclusivity provision of the MWCA.

2.  The Merits

Even if the claim was not precluded by statute, Dr.

Brader's claim for negligent infliction of emotional distress fails because Dr. Brader has not met his burden to show that a reasonable person would have suffered emotional distress under the same circumstances. Specifically, the conduct alleged here does not rise beyond the level of a typical workplace disagreement.

In evaluating a claim for negligent infliction of emotional distress at the summary judgment state, I consider both the existence of "objective corroboration of the emotional distress alleged" and the question whether "[a] reasonable person would have suffered emotional distress attributable to acts of another in th[at] setting." *Sorenson* v. *H & R Block, Inc*., No. 99-10268-DPW, 2002 WL 31194868, at *18-19 (D. Mass. Aug. 27, 2002); *see also DiMare* v. *RealtyTrac, Inc.,* 714 F. Supp. 2d 199, 211 (D. Mass. 2010) ("[P]laintiff must prove that a reasonable person in her position would have suffered the level of emotional distress that she suffered").

While questions of reasonableness with respect to suffering emotional distress are usually reserved for the finder of fact, *see Payton* v. *Abbott Labs*, 437 N.E.2d 171, 181 (Mass. 1982), "summary judgment is appropriate when the evidence, and all reasonable inferences derived therefrom, can lead to only one conclusion." *Taylor* v. *Swartwout,* 445 F. Supp. 2d 98, 106 (D. Mass. 2006). With this in mind, I cannot find that a

reasonable person in Dr. Brader's position would have suffered the level of emotional distress that he has suffered, especially in the absence of record evidence that his conversations and so-called "harassment" constituted anything more than professional disagreement.

Therefore, I will grant Biogen's motion for summary judgment with respect to Dr. Brader's negligent infliction of emotional distress claim.

## IV. CONCLUSION

For the reasons set forth above, Biogen's motion for summary judgment [Dkt. No. 46] is GRANTED as to all claims.


*/s/ Douglas P. Woodlock_____*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE